ORIGINAL

# I : CV01-0757

In The United States Magistrate Court
For The Middle District
of Pennsylvania

(OTN: E906722-5)

Randy Alan Starner: Inmate in
Cumberland County Prison.

RECEIVED

APR 2 8 2001

MARY E. D'ANDREA, CLERK

V.

FILED
SCRANTON

APR 3 0 2001

PER _____
DEPUTY CLERK

Edward E. Guido: Cumberland
County, Commonwealth Judge.

Greg M. Richardson: Cumberland
County, Parole Officer.

# "Complaint"

I am bringing this complaint before your Honorable Court praying that I may receive releife.

I am formally charging said defendants with:

1.) Unprofessional conduct unbecoming of their said office;

2.) Negligence; not replying to offical court business;

3.) Questionable Malice; allowing personal feelings to influence

conduct pertaining to offical court business.

"Facts"

On April 7, 2001 Plaintiff contacted said Defendants by formal letter pertaining to Maximum date; of a D.U.I. sentence, 42 Days > no less than 20 months. Immediate parole to a mandatory 90 Days for Driving Under Suspension D.U.I. Related.

Sentencing date, October 5, 1999. Plaintiff was paroled,

January 1, 2000. Was REINCARCERATED June 10, 2000 per parole violation, (Street Time) forfeited. New maximum date December 30, 2001; according to prison files.

## "Discussion"

Plaintiff questions said date, alleged date September 24, 2001. Plaintiff also alleges that said defendants allowed personal feelings to influence their professional conduct and judgment.

Even if Plaintiff is not favorably excepted on the personal level. Business pertaining to Plaintiffs legal issues concerning his case/sentence is of the most highest professional nature.

Requiring officals that are related to Plaintiffs issues to respond accordingly when acting under color of their office...

As of April 23, 2001 Plaintiff has not received a response from Defendants, pertaining to the

Maximum date of Plaintiffs sentence.

Wherefore, Plaintiff prays that the Honorable Court assist Plaintiff to obtain the Releif which he may be entitled.

I declare under penatly of Perjury that the foregoing is true and correct.

Executed on:

April 23, 2001

_Randy Alan Starner_
Plaintiffs Signature



COPY

In The United States District
Court for the Middle
District of Pennsylvania

FILED
SCRANTON

APR 3 0 2001

PER _____
DEPUTY CLERK

## 1 : CV01-0757

Complaint

RECEIVED
FILED
SCRANTON

APR 2 0 2001

PER _____
DEPUTY CLERK

Civil Action

Case No.

1983 FORM

**FORM TO BE USED BY PRISONERS IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT 42
USC PARA. 1983**

_____

_Randy Alan Starner_

_____

[Enter above the full name of the
Plaintiff or Plaintiffs in this action]

In the United States District
Court for the Middle
District of Pennsylvania

"Dr. Daniels" - Physician - Prison.
"Mrs. Sneed" Deputy Warden of Treatment.
"Mr. Reitz" Warden of Prison.
"County of Cumberland" - COMMISSIONERS OFFICE
(RICHARD REVIANO)
(COMMISSIONER)

[Enter above the full name of the
Defendant or Defendants in this action]

I.     **Previous Lawsuits**

A. Have you begun other lawsuits in State or Federal Court
dealing with the same facts involved in this action or
otherwise relating to your imprisonment?

Yes _____     No _X___

B. If your answer to A. is yes, describe each lawsuit in
the space below. (If there is more than one lawsuit,
describe the additional lawsuits on another piece of
paper, using the same outline).

_____

_____

_____

_____

_____

_____

_____

_____

-2-

1. Parties to this previous lawsuit
   Plaintiffs: _____

   _____

   Defendants: _____

   _____

2. Court (if Federal Court, name the District; if State
   Court, name the County).

   _____

3. Docket Number: _____

4. Name of Judge to whom case was assigned:

   _____

5. Disposition (for example: was the case dismissed?

   Was it appealed? Is it still pending? _____

6. Aproximate Date of Filing Lawsuit: _____

7. Approximate Date of Disposition: _____

II.  Place of Present Confinement: *Cumberland County Prison*
     *Carlisle, Pa 17013*

A. Is there a Prisoner Grievance Procedure in this Insti-
   tution?                                    Yes _X_   No ____

B. Did you present the facts relating to your complaint in the
   State Prisoner Grievance Procedure?    Yes _X_   No ____

C. If your answer is YES:

   1. What steps did you take? *Wrote Formal Letter*
      *to Warden, Deputy Warden, also gave*
      *copy of letter to Dr. Daniels.*

   2. What was the result? _____
      *Dr. Daniels refused to provide*
      *adequate medical needs (operation)*
      *for Carpal Tunnel.*

-3-

D. If your answer is **NO**, explain why not: _____

_____

_____

_____

## III.    Parties

[In the Item A below, place your name in the first blank and place your present address in the second blank. Do the same for additional plaintiffs, if any].

A. Name of Plaintiff    *Randy Alan Starner*

   Address:    *Cumberland County Prison*
   *1101 Claremont Rd Carlisle Pa. 17013*

[In the Item B below, place the full name of the defendant in the first blank, his official position in the second blank, and his place of employment in the third blank. Use item C for the names, positions, and places of employment of any additional defendants].

B. Defendant    *DR. Daniels*    is
   employed as    *Physician - for Cumberland County*    at
   *Prison.*

C. Additional Defendants: *Warden - MR. Reitz*
   *Deputy Warden Treatment - MR. Sneed*
   *and Cumberland County Commissioner's*
   *Office (Richard Revigno - Commissioner)*

## IV.    Statement of Claim:

State here as briefly as possible the **facts** of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates and places. Do not give any legal arguments or cite any cases or statutes. if you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. [Use as much space as you need. Attach extra sheet if necessary].

_____

*SEE Atached Sheets*

_____

_____

-4-

V.    **Relief:**

**State briefly exactly what you want the Court to do for you**
Make no legal arguments. Cite no cases or statutes.

1.) To have operation to relieve pain and numbness in hand & arm, both hands, wrist and arms.

2.) Compensated for violation of Rights, Pain and suffering.

(#500.00 per Day, Beginning December 4, 2001, to ? )

-5-

Signed this ___13___ day of _April_____, 2001.

_Randy Alan Starner_____

[Signature of Plaintiff or Plaintiff

Executed at _Cumberland County Prison Carlisle, Pa._
          [Name of Institution, City, County]          17013

I declare under penalty of perjury that the foregoing is true
and correct.

Executed on ___April 13, 2001_____
              [Date]

_Randy Alan Starner_____

[Signature of Plaintiff or Plaintiff

I am an Inmate at the Cumberland County Prison, Carlisle, Pennsylvania. I have been incarcerated since June 24th 2001/per Parole violation. I am serving the balance of my sentence, which will be finished December 30, 2001.

I am filing this suit because of Dr. Daniels, physician Cumberland County Prison. Dr. Daniels by Refusing to provide me medical treatment, is violating my Constitutional Rights.

I am accusing DR. Daniels of violating:

1.) Eighth Amendment
2.) Fourteenth Amendment
3.) Fifth Amendment
4.) Deliberate Indifference
5. Negligence

I also am bringing the Deputy Warden of Treatment into this action, MRS. Sneed. Deputy Warden, MRS. Sneed was notified PRIOR because of a letter I sent to her pertaining to DR. Daniel's Negligence.

I am also bringing the Warden, MR. Reitz into this action because MR. Reitz also was in reciept of same letter pertaining to Dr. Daniels negligence.

THEREFORE, as to MR. Reitz and MRS. Sneed, they are "Either has or is charged with having actual knowledge of DR. Daniels actions, resulting in deprivation of Inmate's Constitutional Rights.

I am an Inmate incarcerated in the Cumberland County Prison Carlisle, Pennsylvania. I have been in the Cumberland County Prison since June 24, 2001/Per Parole Violation. I am serving the balance of my sentence, which will be Finished December 30, 2001.

Monday-December 4, 2000

I went to the medical department "Sick-Call" to have my hand and fingers examined because of pain and numbness.

DR. Daniels ordered test to be done outside the Prison at the Belvedere Medical Center.

Monday - January 22, 2001

I was taken to Belvedere Medical Center to have test done pertaining to Carpal Tunnel. An "electrodiagnostic" examination was performed. The physician, DR. Jurgensen stated that their was significant loss of nerve re-sponce "Reaction time". DR. Jurgensen explained the operation that would correct this problem.

After approximately (2) two weeks went by, and no word from the Medical Department. I called Dr. Jurgensen's office. His secretary informed me that the results were mailed to Dr. Daniels private office inadvertently. Mrs. Burgess/Nurse Cumberland County Prison, informed me that she has been calling Dr. Daniels office numerous times to have results faxed to the Prison.

Friday - February 23, 2001

I went to "sick-call" medical department. I spoke with DR. Daniels concerning the test results. DR. Daniels said, "he did not bring the test results with him." "We'll have to get them in here." I told DR. Daniels, "I hope I don't have to throw paper to have you do your Job." He became hostile, and said; "Are you trying to aggravate me?" I told him "no; I'm the one that's aggravated." He then said; "You brought it in

hERE, you can take it out of hERE. I'm not going to do any thing for you."

FEBRUARY 24-25, 2001 Saturday Su

Over the weekend I wrote a letter to, Warden; MR. Reitz, pertaining to DR. Daniels' negli- gence and Time Table of Delay- ing treatment. A copy of lette was sent to Deputy Warden; Treat ment- MRS. Sneed. A copy was also sent to DR. Daniels.

Monday - February 26, 2001

Said letter was Received by all three parties.

Results arrived at Prison, after 35 days at Dr. Daniels office.

That evening, wrist brace arrived for me. Wrist-brace without support stay. (part that keeps wrist from bending.)

Tuesday - February 27, 2001

Sent Dr. Jurgensen a letter, asking for copy of test Results and his prognosis.

No Reply.

Wednesday - February 28, 2001

Sent Dr. Daniels request slip asking if I was going to be scheduled for surgery. His reply "Conservative management indicated before consideration of surgery."

Wednesday - March 7, 2001

Went to "sick-call" medical department, pertaining to brace. Dr. Woods there this time. Dr. Woo Mr. Teaney (Sgt. of 7AM-3pm shift), Nurse-Burgess and myself, "discussion" Dr. Woods stated

that said brace was no good because of no "stay" wrist support. Another type of brace was to be ordered.

Thursday-March 8, 2001

Sent Dr. Jurgensen notorized letter, formally asking for copy of test results and prognosis. (as of today March 23, 2001 - no reply.)

Wednesday - March 14, 2001

Sent request slip to medical department asking when new brace would come in.

Friday - March 16, 2001

Becky - nurse told me ne[a]

brace should be here today, or

tomorrow.

Saturday - March 17, 2001

New brace arrives an[d]

given to me. New brace is the

same as old brace. Also, supp[ort]

stay (part that keeps wrist f[rom]

bending.) was removed.

Monday - March 19, 2001

Went to Medical D[e]-

partment again, pertaining t[o]

Friday - March 23, 2001
        Brace Returned to me
with tongue depressors sewn
into area where original sup-
port piece goes.

        I declare under penalty
of perjury that the above
Dates and Statements are
true and correct.

April 13, 2001
        Date

        Randy Alan Stern
        Signature

Place: Cumberland County Prison

# Time Table

December 4, 2000: First went to
Medical Department, test ordered.

January 22, 2001 - (49) Days later went
for test, Belvedere Medical Center.

February 26, 2001 - (35) Days to have
test Results faxed, from his private
office, to the Prison.

March 24, 2001 - (26) Days latter, I
Received brace that has been
altered, not in proper form
medically unsound.

December 4, 2000

to

January 22, 2001

$\overline{49}$
Days

to

February 26, 2001

$\overline{35}$
Days

to

March 24, 2001

$\overline{26}$
Days

$\overline{110}$
Total
Days

(And Still More Day's
to Go By!)

Under penalty of Purjury

the above is true and correct.

April 13, 2001
Date

Randy Alan Garner
Signature

Place: Cumberland County Prison

## Discussion

I fail to understand how, after all the time that has gone by, that I have accomplished nothing. When I first went to the Medical Department on December 4, 2000, until present date, I still have not had my medical needs adequately met.

April 13, 2001
Date.

Randy Alan Stauffer
Signature.

United States District Court
Middle District of Pennsylvania

Randy Alan Starner
           Plaintiff's

                    V.

"Dr. Daniels" Prison Physician
"Mrs. Sneed" Deputy Warden of Treatment
"Mr. Earl Reitz" Warden of Prison
County of Cumberland Commissioner's office:
           Defendant's    (Richard Revigno)
                          Commissioner

Civil case
No._____

Judge:
_____

## Application to Proceed in Forma Pauperis

1.) I am willing to pursue my claims in this action under the new provisions of the Prison Litigation Reform Act, understanding that pursuing my claim requires payment of a partial filing fee and deductions of sums from my prison account when funds exist

until the filing fee of #150.00 has been paid in full.

2.) I have enclosed an executed Authorization form which authorizes the Institution holding me in custody to transmit to the Clerk a certified copy of my trust account for the past six (6) months as well as payments from the account in the amounts specified by 28 U.S.C.§ 1915 (b).

3.) I am not employed at the Institution. (Cumberland County Prison)

4.) I do not own any PROPERTY, I do not have a bank account, I do not own a automobile.

5.) I do RECEIVE money, 5$10.00 now and then from friends.

I certify under penalty of PURJURY and Title 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: APRIL 13, 2001       Randy Alan Steiner
                            Signature

United States District Court
Middle District of Pennsylvania

RANDY ALAN STARNER
        Plaintiff

                V.

"DR DANIELS" - PHYSICIAN - PRISON

"MRS. SNEED" - DEPUTY WARDEN OF TREATMENT

"MR REITZ" - WARDEN OF PRISON
                      COMMISSIONERS
"COUNTY OF CUMBERLAND" OFFICE
                Defendant's (RICHARD
                            REVIGNO)

Affidavit In
Support of Motion
To Proceed In Forma
Pauperis and For
Appointment of
Pro Se' Status

Civil Action
No._____

I, Randy Alan Starner declare:

1.) I am the plaintiff in the above titled action.

2.) I believe I am entitled and intend to bring this action in the United States District Court, Middle District of Pennsylvania (Cumberla[nd])

County, Pennsylvania against the above name defendants.

3.) I believe that I am entitled to the Redress sought in this action

4.) I have and know the contents of the complaint and believe them to be TRUE.

5.) I am without assets and have no income other than what few dollars I RECIEVE for canteen.

6.) Because of my poverty, I am unable to pay the costs of this action, to give security therefor, or to employ an attorney.

I declare under penalty of PERJURY that the above statement is TRUE and CORRECT.

Date: April 13, 2001

_____
Signature

Place: Cumberland County Prison

Today's Date: 04/02/2001

Transactions from 11/01/2000 to 04/02/2001

Page 1 of 2

Inmate Name: STARNER RANDY ALAN

| Transaction Date/Time | Transaction Type | Transaction Amount | Code | Clerk | Description/Reference Deposit Amt/Withdrawal | Running Balance | Receipt Number |
|---|---|---|---|---|---|---|---|
| | | | | | Bailiff           00-1177 | | .07 |
| 11/01/2000 07:59 | Deposit | 16.25 | TR | | TR PAY 10/12-25-00 | 16.32 | 66169 |
| 11/02/2000 07:20 | Deposit | 10.00 | CA | | CASH 11-1-00 | 26.32 | 66200 |
| 11/03/2000 09:10 | Withdrawal | -10.00 | WA | | WAR ALLOTMENT | 16.32 | 66367 |
| 11/06/2000 12:01 | Withdrawal | -3.00 | ME | | MEDICAL COOR 10-16-00 | 13.32 | 66503 |
| 11/13/2000 12:11 | Withdrawal | -6.00 | PW | | CK2346 MAILED/U.S. DIST COURT | 7.32 | 67064 |
| 11/14/2000 10:09 | Withdrawal | -4.79 | CO | | COMMISSARY SUMMARY POSTING | 2.53 | 67262 |
| 11/14/2000 12:17 | Deposit | 17.50 | TR | | TR PAY 10-25/11-8-00 | 20.03 | 67347 |
| 11/17/2000 09:12 | Withdrawal | -10.00 | WA | | WAR ALLOTMENT | 10.03 | 67656 |
| 11/17/2000 13:22 | Withdrawal | -2.50 | PI | | COPIES MADE 11-14-00 | 7.53 | 67678 |
| 11/20/2000 18:43 | Withdrawal | -7.21 | CO | | COMMISSARY SUMMARY POSTING | .32 | 67684 |
| 11/29/2000 09:46 | Deposit | 20.00 | TR | | TR PAY 11/8-22-00 | 20.32 | 68511 |
| 12/08/2000 09:36 | Withdrawal | -10.00 | WA | | WAR ALLOTMENT | 10.32 | 68300 |
| 12/12/2000 09:55 | Withdrawal | -7.30 | CO | | COMMISSARY SUMMARY POSTING | 3.02 | 68683 |
| 12/14/2000 10:12 | Deposit | 17.50 | TR | | TR PAY 11-23/12-6-00 | 20.52 | 68715 |
| 12/21/2000 14:35 | Withdrawal | -10.00 | WA | | WAR ALLOTMENT | 10.52 | 70130 |
| 12/25/2000 11:03 | Withdrawal | -10.05 | CO | | COMMISSARY SUMMARY POSTING | .47 | 70765 |
| 12/27/2000 07:55 | Deposit | 7.50 | TR | | TR PAY 12/7-20-00 | 7.97 | 70812 |
| 12/27/2000 08:03 | Deposit | 10.00 | TR | | TR PAY 12/7-20-00    (ADD'L) | 17.97 | 70819 |
| 12/29/2000 09:02 | Withdrawal | -10.00 | WA | | WAR ALLOTMENT | 7.97 | 70962 |
| 01/02/2001 11:05 | Withdrawal | -6.15 | CO | | COMMISSARY SUMMARY POSTING | 1.82 | 71272 |
| 01/05/2001 09:16 | Withdrawal | -1.00 | WA | | WAR ALLOTMENT | .82 | 71478 |
| 01/09/2001 09:29 | Deposit | 8.55 | CA | | CASH 1-5-01 REMOVED FROM WAR | 9.37 | 71599 |
| 01/10/2001 10:14 | Deposit | 17.50 | TR | | TR PAY 12-21-001-3-01 | 26.87 | 71914 |
| 01/22/2001 09:16 | Withdrawal | -3.00 | ME | | MEDICAL COOR 1-15-01 | 23.87 | 72367 |
| 01/22/2001 09:03 | Withdrawal | -19.75 | PW | | CK3002? MAILED/SU DISTRICT COURT | 4.12 | 72361 |
| 01/23/2001 10:03 | Withdrawal | -0.90 | CO | | COMMISSARY SUMMARY POSTING | .22 | 72846 |
| 01/24/2001 09:15 | Deposit | 1.25 | TR | | TR PAY 1/4-17-01 | 1.47 | 72961 |
| 01/26/2001 15:07 | Deposit | 10.00 | CA | | CASH 1-23-01 | 11.47 | 73181 |
| 01/30/2001 09:45 | Withdrawal | -10.22 | CO | | COMMISSARY SUMMARY POSTING | 1.25 | 73464 |
| 02/05/2001 09:45 | Withdrawal | -1.25 | CO | | COMMISSARY SUMMARY POSTING | -.00 | 74004 |

Today's Date:    04/02/2001

Transactions from 10/01/2000 thru 04/02/2001

Page 2 of 2

| Transaction Date/Time | Transaction Type | Transaction Amount | Code | Check# | Document Locator Number Deposit From/Withdrawal To | Running Balance | Batch Number |
|---|---|---|---|---|---|---|---|
| | | | | | | | .01 |
| Inmate Name: | STARMER | RANDY | ALAN | | Batch# | 00-1177 | |
| 02/12/2001 09:30 | Deposit | 5.00 | CA | | CASH 2-11-01 | 5.00 | 74412 |
| 02/13/2001 09:36 | Withdrawal | -5.00 | CO | | COMMISSARY SUMMARY POSTING | -.00 | 74645 |
| 02/19/2001 14:00 | Deposit | 5.00 | CA | | CASH 2-18-01 | 5.00 | 74997 |
| 02/20/2001 09:36 | Withdrawal | -5.00 | CO | | COMMISSARY SUMMARY POSTING | -.00 | 75161 |
| 02/26/2001 09:55 | Deposit | 5.00 | CA | | CASH 2-25-01 | 5.00 | 75593 |
| 03/05/2001 09:10 | Withdrawal | -4.95 | CO | | COMMISSARY SUMMARY POSTING | .05 | 76466 |
| 03/12/2001 09:15 | Deposit | 5.00 | CA | | CASH 3-11-01 | 5.05 | 76663 |
| 03/13/2001 09:01 | Withdrawal | -4.97 | CO | | COMMISSARY SUMMARY POSTING | .08 | 77119 |
| 03/26/2001 09:23 | Deposit | 7.00 | CA | | CASH 3-25-01 | 7.08 | 78147 |
| 03/27/2001 09:01 | Withdrawal | -4.24 | CO | | COMMISSARY SUMMARY POSTING | 2.84 | 78331 |
| 04/02/2001 08:45 | Deposit | 3.00 | CA | | CASH 4-1-01 | 5.84 | 78730 |
| 04/02/2001 12:05 | Withdrawal | -.90 | POU | | COPIES MADE 3-29-01 | 4.94 | 78799 |
| | | | | | | | 4.94 |
| Total Withdrawal this Inmate | | -161.16 | | | Total Deposit this Inmate | 166.05 | Ending Balance |

# Authorization
## (Prisoner's account only)

In accordance with 28 U.S.C. § 1915a(2). I submit a certified copy of my account at Cumberland County Prison.

I Randy Alan Starner Request and authorize Cumberland County Prison to send the clerk of courts, For The United States District Court Middle District of, Pennsylvania, to calculate and disburse funds From my prison account in the amounts specified by;

Title 28 U.S.C. § 1915 (b).

This authorization is furnished in connection with the filing of a civil action, and I understand that the filing fee for the complaint is $150.00. I also understand that the entire filing fee will be deducted from my account regardless of the outcome of my civil action. This authorization shall apply to any other agency into whose custody I may be transferred.

Date: April 13, 2001

_Purdy Alan Sturner_
SIGNATURE

United States District Court
Middle District of Pennsylvania

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

RANDY ALAN STARNER
Plaintiff's

V.

"DR DANIELS" - PHYSICIAN - PRISON

"MRS. SNEED" - DEPUTY WARDEN OF TREATMENT

"MR. REITZ" - WARDEN OF PRISON
          " COMMISSIONER'S
"COUNTY OF CUMBERLAND   OFFICE
          Defendant's (RICHARD)
                      (REVIGNO)

Motion to
Grant Plaintiff's
Pro Se' Status

Civil Action

No. _____

Because of my poverty, I am unable to employ an attorney. I pray the Honorable Court grants this motion for plaintiff to proceed, Pro Se' status

I declare under penalty of purjury that the above statement is true and correct.

Date: April, 13, 2001

_Randy Alan Starner_
Signature

Randy Alan Starner
Cumberland County Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

United States District Court
Middle District of Pennsylvania

Randy Alan Starner
    Plaintiff's

V.

"Dr. Daniels" Prison Physician
"Mrs. Sneed" Deputy ad warden of Treatment
"Mr. Earl Reitz" Warden of Prison
County of Cumberland
    Defendants (Richard Revigno) Commissioner's office Commissioner

Proposed Order

Civil Action

No. _____

    This matter having come on regularly for hearing before the assigned Judge on the motion of the plaintiff for leave to proceed with this action in Forma Pauperis and for appointment of ProSe status and it appearing to the court that plaintiff's are entitled to the action they seek by this motion, it is hereby,

Ordered that plaintiff's are autho-rized to proceed with this action in Forma Pauperis, without being required to pay fees and costs and security for them, and it is further;

Ordered that any Recovery in this action shall be paid to the Clerk of the Court, who may pay there from all un-paid fees and costs owed against the plaintiff; it is futher;

Ordered that Plaintiff's Cumberland County Prison, 1101 Claremont Rd, Carlisle Pennsylvania, Is hereby appointed to Represent himself Pro Se "status in this matter, until relieved by order of the United States District Court for the Middle District of Pennsylvania.

Honorable Judge

Signature: _____

B

part of 1

# In The United State District Court For the Middle District of Pennsylvania

## Civil Action

### 1 : CV01-0757

## Case No.

FILED
SCRANTON

APR 3 0 2001

PER _____ RMf _____
DEPUTY CLERK

## Title 42 U.S.C.A. § 1983 Notes.

I am also bringing Cumberland County into this action, For Cumberland County is liable for the actions of it's Prison officials.

In pertaining to this suit; Cumberland County is held liable, because of no action of its Prison Officials in "allowing said deprivations" of Inmates Constitutional Rights by DR. Daniels. "Therefore, In accordance with Title 42 U.S.C.A. § 1983 note 74, Damages."

Note 74; Compensatory damages for deprivation of Federal Rights are governed by Federal standards, which means that both Federal and State Rules on damages may be utilized, whichever better serves the policies expressed in the Federal statutes. Sullivan v. Little Hunting Park Inc. (Va. 1969, 90 S. Ct., 400, 396 U.S. 229, 24 L. Ed. 2d 386).

Title 42 U.S.C.A. § 1983, note 74

In civil Rights case, federal common law is applied in Respect to compensatory or even nominal damages as well as to exemplary or punitive damages.

Basista v. Weir, C.A Pa. 1965, 340 F. 2d 74.

Title 42 U.S.C.A. § 1983 note-344

Color of State Law

WHERE physician who examined PRISONER at County Jail was acting in his official capacity as a County Health officer in tREating the PRISONER, the tREatment was "State Action" within meaning of this section and the physician was not immune fRom suit undER the act.

Robinson v. JoRdan, C.A.Tex. 1974, 494 F.2d 793.

Title 42 U.S.C.A. §1983, note 355

In action by prisoner against prison officials under this section authorizing recovery of damages against individual defendant for unjustifiable violation of constitutional Rights "Under Color" of state law, individual actions Rather than general prison practices must be critically examined to determine if constitutional violations have occurred.

Collins v. Schoonfield, D.C. Md. 1973

363 F. Supp. 1152.

42 U.S.C.A. § 1983, note 693

Within context of prisoners civil Rights action against prison officials to Recover for officials alleged "deliberate deprivation" of prisoners constitutional Rights, term "deliberate deprivation" denotes two species of culpability: "actual intent" and Recklessness; actual intent encompasses both the special intent to deprive prisoner of constitutional Rights, and Recklessness" comprehends objective standard or whether officials' conduct is with such disregard of prisoner's

clearly established constitutional Rights that the action cannot be Reasonably characterized as being in good Faith.

Little v. Walker, C.A.Ill. 1977, 552 F. 2d 193, certiorari denied 98 S. Ct. 1507, 435 U.S. 932, 55 L. Ed. 2d 530.

Title 42 U.S.C.A. § 1983, note 725

While mere inadvertence or negligence on the part of prison officials can not support a prisoner's civil Rights action Raising U.S.C.A. Const. Amend. 8 issues, deliberate indifference Regardless of how evidenced, either by actual or Recklessness, will provide a sufficient Foundation. Little v. Walker, C.A. Ill. 1977, 552 F.2d 193, certiorari denied 98 S. Ct. 1507, 435 U.S. 932, 55 L. Ed. 2d 530.

Title 42 U.S.C.A. § 1983, note 1148

A defendant will not be held liable under this section proscribing a deprivation of Rights unless he was personally involved in causing the deprivation of a constitutional Right or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional Rights.

Triplett v. Azordegan, C.A. Iowa 1978, 570 F.2d 819.

part of 1

# In The United States District Court for the Middle District of Pennsylvania

# Civil Action

# Case No.

I Have spoken with all three (3) officers seperatly. MR. Ilgenfritz, MR. McGinty and MR. Teaney are willing to testify. We've all have come to an agreement, as not to Jeopardize their Jobs. They shall be subpoenaed.

I declare under penalty of purjury that the above statement is true and correct.

Date: 4·3·2001

_Randy May Sturner_
SIGNATURE

Place: Cumberland County Prison

# Witness

Correctional Officer: 7Am - 3pm LT. Ilgenfritz; February 23, 2001. Said officer was present during "sick-call" that day in Medical Department. Said officer heard conversation between Dr. Daniels and inmate (myself). Officer heard Dr. Daniels state that he was not going to do anything for inmate, (myself).

## Witness

CORRECTIONAL OFFICER: 7Am 3pm

Sgt. Teaney; On March 7, 2001 was present during discussion over brace. Also was in Medical Department many times when I went to "Sick-call" complaining about my numbness and pain in hand, fingers, arm.

## Witness

Correctional Officer: 7Am - 3pm Mr. McGinty; Transported said Inmate (myself) to the Belvedere Medical Center on January 22, 2001. Said officer was present in examining Room while tests were being performed. Said officer heard Dr. Jurgensen explain operation that would correct problem, Carpal Tunnel.

# In The United States District Court for the Middle District of Pennsylvania

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

Randy Alan Starner

V.

"Dr. Daniels": Prison Physician

"Mrs. Sneed": Deputy Warden of Treatment

"Mr. Earl Reitz: Warden of Prison

"County of Cumberland": office commissioners

(Richard Revigno - Commissioner)

Petition For Issuance of Subpoena

Civil Action

No. _____

Plaintiff prays that
this Honorable Court; to have,
CO. MR. McGinty _____, Officer;
at Cumberland County Prison
Carlisle, Pennsylvania - 17013.
To appear and give testimony
on behalf of Plaintiff.

4·13·2001
Date

_Randy Alan Starner_
Signature

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

# In The United States District Court for the Middle District of Pennsylvania

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

Randy Alan Starner

V.

"Dr. Daniels" Prison Physician
"Mrs. Sneed" Deputy Warden of Treatment
"Mr. Earl Reitz" Warden of Prison
"Court of Cumberland" Commissioner's Office
(Richard Revigno Commissioner)

Petition For Issuance of Subpoena

Civil Action No. _____

Plaintiff prays that this Honorable Court; to have, Sgt. MR. Teany _____, Officer; at Cumberland County Prison Carlisle, Pennsylvania - 17013. To appear and give testimony on behalf of Plaintiff.

4 · 13 · 2001
Date

_Randy Alan Starner_
Signature

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd
Carlisle, Pa. 17013

# In The United States District Court For the Middle District of Pennsylvania

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

Randy Alan Starner

V.

"Dr. Daniels" Prison Physician
"Mrs. Sneed" Deputy Warden of Treatment
"Mr. Earl Reitz" Warden of Prison
(County of Cumberland" Commissioner's Office)
Richard Revigno (Commissioner)

Petition For Issuance of Subpoena

Civil Action

No. _____

Plaintiff prays that this
Honorable Court; to have,
LT. Mr. Ilgen Fritz_____, Officer,
at Cumberland County Prison
Carlisle, Pennylvania. 17013
To appear and give testimony
on behalf of Plaintiff.

4.13.2001
Date

Randy Alan Starner
Signature

Randy Alan Starner
Cumberland Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013

D.

part of 1

# In The United States District Court for the Middle District of Pennsylvania

## Civil Action

## Case No.

_____

## Evidence

Febuary 23, 2001

Warden: MR. Reitz
Cumb. Co. Prison
1101 Claremont Rd.
Carlisle, Pa. 17013


Dear Warden: MR. Reitz

I am contacting your office concerning the medical Dept., one MR. Daniels.

I was taken to the Belvedere Medical Center the last week of January or the first week of Febuary. I tried to get the proper dates, administration was reluctant in giving said dates. I was taken to the medical center by Co. McGinny to have test performed on my right arm and hand pertaining to Corporal tunnel. The test results were positive. DR. Craig J. Jurgensen informed me that there was significant loss of nerve funtion. His recommendation, surgery to ease pressure on said nerves, so that feeling and coordination will be restored).

It has been approximately (3) weeks since I've had the tests. I called the Medical Center on Febuary 22, 2001. The secretary told me the test Results were sent to MR. Daniel's office weeks ago. This I already knew, for MR. Daniels told me this also, weeks ago. I can understand the test Results inadvertently being sent to his private office. What I can not understand is; Nurse Burgess has been calling numerous times asking to have said Results faxed from DR. Daniels office. MR Daniels has come to this prison many times in the past few weeks, knowing that the Medical Department here at the prison have been contacting his office/secretary concerning these test Results.

MR Daniels and his office have been negligent, for ample time has patiently been given to have said Results forwarded from his office.

I am contacting your office MR. Reitz, using the informal process first. I pray that this matter can be handled internally.

copies:
Warden: MR. Reitz
Treatment: MR. Speed

Respectfully

## Amendment

On Febuary 24, 2001, I received the Relevant dates pertaining to attached letter.

On December 4, 2000 I went to sick-call to discuss that I was experencing numbness in my hand and fingers, along with deep pain up my arm too and including my elbow. DR Daniel's had arrangements made for test to be performed in relation to "Corporal Tunnel."

Time table; December 4, 2000 until the test; January 22 2001, a total of 38 [50] days.

On January 22, 2001 test were performed, today is Febuary 26, 2001, This is a time span 36 days. The test results are still not in the hands of the medical department here at the prison. I returned to the medical department on Febuary 21, 2001 too inform them that my symptoms were becoming irritating. this is when nurse Burgess told me she would try again to have DR. Daniel's secretary fax, or DR. Daniel's himself bring the results from his office.

\* Addition of days not
CORRECT.

I RETURNED to sick-call on Friday
the (Febuary 23, 2001) I was told by NURSE
BURGess she was still waiting for DR.
Daniel's secRatary to fax them. I then
desided to wait and speek with DR. Daniel's
PERSONALLY. This I REGRET only lead to
DR. Daniel's becoming hostile with me.
I did not aRgue with DR. Daniel's, as LT.
Elgin Fritz was there. He can comfRim
this if need be.

This is wheRe things stand; Biginning
to PRESENT, 66 days have passed, as of
Monday - Febuary 26, 2001; 36 days have
passed waiting for test Results from
DR. Daniel's office. And the waiting is
Continual MR. Reitz.

I charge DR. Daniel's, and his office
with gRoss negligence.

Again I pRay MR. Reitz that your
office can inteRvene, so that this injustice
may be corrected internally

RespectFully,
Randy Alan Starner

Date: Febuary 24, 2001

## CUMBERLAND COUNTY PRISON
## REQUEST FORM

FROM: _____          DATE: _____

UNIT: _____

| SECURITY STAFF | TREATMENT STAFF |
|---|---|
| ❑ WARDEN | ❑ DEPUTY WARDEN-TREATMENT |
| ❑ DEPUTY WARDEN-SECURITY | ❑ WORK RELEASE MANAGERS |
| ❑ DEPUTY WARDEN-OPERATIONS | ❑ MEDICAL DEPARTMENT |
| ❑ TRAINING SPECIALIST | ❑ EARNED TIME CASE MANAGER |
| ❑ ACCOUNTS OFFICER | ❑ DRUG/ALCOHOL CASE MANAGER |
| ❑ RECORDS DEPARTMENT | ❑ CORRECTIONAL COUNSELOR |
| ❑ MAINTENANCE DEPARTMENT | ❑ PSYCHOLOGIST |
| Shiftleader: _____ | ❑ CHAPLAIN |
| | ❑ INSTITUTIONAL PAROLE OFFICER |

### *BE SPECIFIC IN EXPLAINING REQUEST*

_____

_____

_____

_____

_____

_____

_____

_____

ANSWERED BY: *Helen Snead*          DATE: 2/28/01

In reply to your correspondence dated 2/23/01
I have spoken with Dr. Daniels. His office
staff reported sending your test results and
we are not in receipt of them. Dr. Daniels
has reviewed the test results and in his
opinion, corrective surgery is not

GEN-5                                    REVISED: 11-00

## CUMBERLAND COUNTY PRISON
## REQUEST FORM

FROM: _R. Starner_      DATE: _2·28·2001_

UNIT: _D-15_

| SECURITY STAFF | TREATMENT STAFF |
|---|---|
| ☐ WARDEN | ☐ DEPUTY WARDEN-TREATMENT |
| ☐ DEPUTY WARDEN-SECURITY | ☐ WORK RELEASE MANAGERS |
| ☐ DEPUTY WARDEN-OPERATIONS | ☒ MEDICAL DEPARTMENT |
| ☐ TRAINING SPECIALIST | ☐ EARNED TIME CASE MANAGER |
| ☐ ACCOUNTS OFFICER | ☐ DRUG/ALCOHOL CASE MANAGER |
| ☐ RECORDS DEPARTMENT | ☐ CORRECTIONAL COUNSELOR |
| ☐ MAINTENANCE DEPARTMENT | ☐ PSYCHOLOGIST |
| Shiftleader: _____ | ☐ CHAPLAIN |
| | ☐ INSTITUTIONAL PAROLE OFFICER |

*BE SPECIFIC IN EXPLAINING REQUEST*

Am I going to be scheduled for Surgery, for my Carpal Tunnel?

_Randy Alan Starner_

ANSWERED BY: _Daniels_      DATE: _3.2.01_

Conservative management indicated before consideration of surgery. May be helpful to discuss with Dr. Wood as second opinion.

_W. Daniels_

GEN-5      REVISED: 11-00

03-13-01  THU 12:21 FAX 717 213 4782          DUMB  ty PRISON                                    @015

EMG Data

Date:        January 22, 2001
Patient:     Randy Starner
Physician:   J. Craig Jørgensen, M.D.

### Summary of EMG and NCV Findings.

NERVE CONDUCTION REPORT

| Nerve | Site | Onset (ms) | Delta (ms) | Dur (ms) | Ampl (uV) | Dist (cm) | NCV (m/s) |
|-------|------|------------|------------|----------|-----------|-----------|-----------|
| R Median Motor | Wrist | 8.00* | ---- | ---- | 2200.0 | ---- | ---- |
| | ante cub | 12.80 | 4.80 | ---- | 1880.0 | 23.0 | 47.90* |
| R Median Sensor | wrist | *** | Unobtainable | | | | |
| R Ulnar Motor | Site 1 | 3.80 | ---- | ---- | 8800.0 | ---- | ---- |
| | Site 2 | 8.90 | 5.10 | ---- | 9700.0 | 28.0 | 54.90 |
| R Ulnar F-Wave | Wrist | 34.80 | 34.80 | ---- | 190.0 | ---- | ---- |
| L Median Motor | Wrist | 4.50* | ---- | ---- | 7400.0 | ---- | ---- |
| | ante cub | 8.40 | 3.90 | ---- | 7200.0 | 24.0 | 61.50 |
| L Median Sensor | wrist | 3.81 | ---- | 1.68 | 13.4 | ---- | ---- |

EMG NEEDLE STUDY

| Side | Muscle | Nerve | Root | Fib | Psw | Ply | Fsc | Rec | Comment |
|------|--------|-------|------|-----|-----|-----|-----|-----|---------|
| Rt | 1stDorInt | Ulnar | C8-T1 | 0 | 0 | Nml | 0 | Nml | Normal |
| Rt | Biceps | Musc C | C5-6 | 0 | 0 | Nml | 0 | Nml | Normal |
| Rt | Oppon Pollicis | | | 0 | 1+ | 2+ | 0 | 75% | Abnormal |

03/15/01  THU 12:24 FAX 717 243 3702      JUMB CO PRISON                              ☑015

NAME        Randy Starner                        ELECTROMYOGRAPHY
ADDRESS     1101 Claremont Road                  NERVE CONDUCTIONS
            Carlisle, PA 17013

            DOB: 09/10/1955

            Outpatient    Michael O. Daniels, M.D.      January 22, 2001

            Method: Excel 2-channel EMG by Cadwell.

IMPRESSION   :   DELAYED/DEPRESSED DISTAL MEDIAN NERVE CONDUCTION —
                 RIGHT.

COMMENT      :   The patient reports sensory symptoms in the hand.  Motor and sensory nerve
conductions were performed using .3 ms supramaximal stimulation.  The distal evoked
response for the median nerve recorded over the opponens pollicis is markedly delayed in
onset to 8.0 ms (normal less than 4.0).  The M-response illustrated below is significantly
depressed in amplitude — 2,200 µV (normal 7,000-10,000 µV).  No distal median nerve
sensory response could be obtained over the flexor skin of the second finger.  Distal median
nerve conduction obtained on the left side by the same technique is borderline normal.  Ulnar
nerve conductions are intact.  The ulnar F-response is mildly delayed.

            Needle examination revealed rare positive waves in the opponens pollicis.  Action
potentials produced with voluntary contraction were occasionally polyphasic in nature.

            The findings are indicative of distal median nerve compression within the carpal
canal.

JCJ/gmj          NERVE CONDUCTION STUDIES



850 WALNUT BOTTOM ROAD
CARLISLE, PA 17013
(717) 243-3944                                      J. CRAIG JURGENSEN, M.D.
                                                         NEUROLOGY

E

part of 1

# In The United States District Court For the Middle District of Pennsylvania

## Civil Action

## Case No.

_____

## Case Law

Estelle v. Gamble

429   U.S.   97

No. 75-929

5th Cir.

RE: Deliberate Indifference, Serious illness or injury constitutes cruel and unusual punishment, 8th Amend. Made applicable to the States by the 14th Amend. Also: The holding of Estelle, Relates to convicted prisoners, (8th Amend.) whereas pretrial detainee's have a (14th Amend.) issue.

Estelle v. Gamble
429 U.S. 97
No. 75-929
Fifth Cir

Respondent state inmate brought this civil Rights action under 42 U.S.C. 1983 against petitioners, the state Corrections department medical director (Gray) and two correctional official, claiming that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment for inadequate treatment of a back injury assertedly sustained while he was engaged in Prison work. The District Court dismissed the complaint for failure to state a claim upon which Relief could be granted. The Court of appeals held that the alleged insufficiency of the medical treatment required Reinstatement of the complaint. Held: Deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment

controvening the Eighth Amend-
ment. Here, However, Respondent's claims
against Gray do not suggest such indif-
ference, the allegations Revealing that
Gray and other medical personnel saw
Respondent on 17 occasions during a
3-month span and treated his injury
and other problems. The Failure to
perform an X-Ray or to use additional
diagnostic techniques does not consti-
tute cruel and unusual punishment
but is at most medical malpractice
cognizable in the state courts. The ques-
tion whether Respondent has stated
a constitutional claim against the
other petitioners, the Director of the
Department of Corrections and the war-
den of the prison, was not separately
evaluated by the Court of Appeals and
should be considered on Remand Pp. 101-108.

516 F. 2d 937, Reversed and Remanded.

Marshall, J., delivered the opinion of
the Court, in which Burger, C.J., and
Brennan, Stewart, White, Powell,

and Rehnquist, JJ., joined. Blackmun, J., concurred in the judgment. Stevens, J., filed a dissenting opinion, post, p. 108.

Bert W. Pluymen, Assistant Attorney General of Texas, argued the cause for petitioners pro hac vice. With him on [429 U.S. 97, 98] the brief were John L. Hill, Attorney General.

Daniel K. Hedges, by appointment of the Court, 425 U.S. 932, argued the cause and filed a brief for respondent pro hac vice.

MR. Justice Marshall delivered the opinion of the Court,

Respondent J. W. Gamble, an inmate of the Texas Department of Corrections, was injured on November 9, 1973, while performing a prison work assignment. On February 11, 1974, he instituted this civil rights action under 42 U.S.C. 1983,

1 complaining of the treatment he received after the injury. Named as defendant's were the petitioners, W. J. Estelle, Jr., Director of the Department of Corrections, H. H. Husbands, warden of the prison, and Dr. Ralph Gray, medical director of the Department and chief medical officer of the prison hospital. The District Court, sua sponte, dismissed the complaint for failure to stat a claim upon which relief could be granted. 2 The Court of Appeals reversed and remanded with instructions to reinstate the complaint. 516 F.2d 937 (CA5-1975). We granted certiorari, 424 U.S. 907 (1976). [429 U.S. 97, 99]

# I

Because the complaint was dismissed for failure to state a claim, we must take as true its handwritten, pro se' allegations. Cooper v. Pate, 378 U.S. 546 (1964).

According to the complaint, Gamble was injured on November 9, 1973, when a bale of cotton 3 fell on him while he was unloading a truck. He continued to work but after four hours he became stiff and was granted a pass to the unit hospital. At the hospital a medical assistant, "Captain" Blunt checked him for a hernia and sent him back to his cell. Within two hours the pain become so intense that Gamble Returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, Gamble saw a DR. Astone who diagnosed the injury as a lower back strain, prescribed Zactirin (a pain reliever) and Robaxin (a muscle relaxant), 4 and placed Respondent on "cell-pass, cell-feed" status for two-days, DR. Astone who continued the medication and cell-pass, cell-feed for another seven days.

He also ordered that respondent be moved from an upper to a lower bunk for one week, but the prison authorities did not comply with that directive. The following week, Gamble returned to Dr. Astone. The doctor continued the muscle relaxant, but prescribed a new pain reliever, Febridyne, and placed respondent on cell-pass for seven days, permitting him to remain in his cell except for meals and showers. On November 26, respondent again saw Dr. Astone, who put respondent back on the original pain reliever for five days and continued the cell-pass for another week. [429 U.S. 97, 100]

On December, despite Gamble's statement that his back hurt as much as it has the first day, Dr. Astone took him off cell-pass, thereby certifying him to be capable of light work. At the same time, Dr. Astone precribed Febridyne for seven days. Gamble then went to a Major Muddox

and told him that he was in too much pain to work, Muddox had Respondent moved to "administrative segregation." 5 On December 5, Gamble was taken before the prison disciplinary committee, aparently because of his refusal to work. When the committee heard his complaint of back pain and high blood pressure, it directed that he be seen by another doctor.

On December 6, Respondent saw petitioner Gray, who performed a urinalysis, blood test, and blood pressure measurement. Dr. Gray prescribed the drug Ser-Ap-Es for the high blood pressure and more Febridyne for the back pain. The following week Respondent again saw Dr. Gray, who continued the Ser-Ap-Es for an additional 30 days. The prescription was not filled for four days, however, because the staff lost it. Respondent went to the unit

hospital twice more in December; both times was seen by Captain Blunt, who perscribed Tlognolos (described as a muscle relaxant). For all of December, Respondent Remained in administrative segragation.

In early January, Gamble was told on two occasions the he would be sent to the "farm" if he did not return to work. He refused, nonetheless, claiming to be in too much pain. On January 7, 1974, he requested to go on sick call for his back pain and migraine headaches. After an initial refusal, he saw Captain Blunt who prescribed sodium salicylate (a [429 U.S. 97, 101] pain reliver) for seven days and Ser-Ap-Es for 30 days. Respondent returned to Captain Blunt on January 17, and January 25, and received renewals of the pain reliver prescription, both times. Throughout the month, Respondent was kept in

administration segregation.

On January 31, Gamble was brought before the prison disciplinary committee for his refusal to work in early January. He told the committee that he could not work because of his severe back pain and his high blood pressure. Captain Blunt testified that Gamble was in "first class" medical condition. The committee, with no further medical examination or testimony, placed Respondent in solitary confinement.

Four days later, on February 4, at 8 a.m. Respondent asked to see a doctor for his chest pains and "blank outs". It was not until 7:30 that night that a medical assistant examined him and ordered him hospitalized. The following day a Dr. Heaton preformed an electrocardiogram; one day later Respondent was placed on Quinidine for treatment of irregular

Cardiac Rhythm and moved to administrative segregation. On February 7, Respondent again experienced pain in his chest, left arm, and back and asked to see a doctor. The guards refused. He asked again the next day. The guard again refused. Finally, on February 9, he was allowed to see Dr. Heaton, who ordered Quinidine continued for three more days. On February 11, he swore out his complaint.

## II

The gravamen of Respondent's 1983 complaint is that petitioners have subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth. 6 See Robinson v. California, [429 U.S. 97, 102] 370 U.S. 660 (1962). We therefore base our evaluation of the respondent's complaint on those Amendments and our dicisions interpreting them

The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the court and need not be repeated here. See, e.g., Gregg v. Georgia, 428 U.S. 153, 169-173 (1976) (Joint opinion of Stewart, Powell, and Stevens, JJ. (hereinafter Joint opinion)); see also Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif. L. Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. Id., at 842. Accordingly, this court first applied the Eight Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See Wilkerson v. Utah, 99 U.S. 130, 136 (1879) ("[I]t is safe to affirm that punishment of torture ... and all others in the same line of unnecessary cruelty, are forbidden by that amendment ..."); In re Kremmler 136 U.S. 436, 447 (1890) ("Punishments are

cruel when they involve torture or a lingering death...").

Our more recent cases, however, See, e.g., Gregg v. Georgia, supra, at 171 (Joint opinion); Trop v. Dulles, 356 U.S. 86, 100-101 (1958); Weems v. United States, 217 U.S. 349, 373 (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency..." Jackson v. Bishop, 404 F.2d 571, 579 (CA8 (1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatable with "the evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, supra, at 101; see also Gregg v. Georgia, supra, at 172-173 (Joint opinion); Weems v. United States supra, at 378, [429 U.S. 97, 103] or which "involve the unnecessary and wanton infliction of pain," Gregg v. Georgia, supra, at 173 (Joint opinion); see also Louisiana ex Rel. Francis v. Resweber,

329 U.S. 459, 463 (1947); Wilkerson
V. Utal, supra, at 136. I

     These elementary principles est-
ablished the government's obligation to
provide medical care for those whom
it is punishing by incarceration. An
inmate must rely on prison authorit-
ies to treat his medical needs; if the
authorities fail to do so, those needs
will not be met. In the worst cases,
such as failure may actually produce
physical "torture or a lingering death,"
In re Kemmler, supra, the evils of
most immediate concern to the dra-
fters of the Amendment. In less
serious cases, denial of medical care
may result in pain and suffering
which no one suggest would serve
any penological purpose. (f. Gregg
V. Georgia, supra, at 182-183 (Joint
opinion). The infliction of such
unnecessary suffering is incon-
sistent with contempory standards
of decency as manifested in mod-
ern legislation & codifing the

common law [429 U.S. 97, 104] view that "it is but Just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." 9

We therefore conclude that deliberate indifference to serious medical needs of prisoner's constitutes the "unnecessary and wanton infliction of pain," Gregg v. Georgia, supra, at 173 (Joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs 10 or by prison guards in intentionally denying or delaying access to medical [429 U.S. 97, 105] care 11 or intentionally interfering with the treatment once prescribed. 12 Regardless [Regardless] of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under 1983.

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment state a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. In Louisiana ex rel. Francis v. Resweber, 329 U.S. 459 (1947), for example, the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to eletrocute him after a mechanical malfunction had thwarted the first attempt. Writing for the plurality, Mr. Justice Reed reasoned that the second execution would not violate the Eighth Amendment because the first attempt was an "unforeseeable accident." Id., at 464. Mr. Justice Frankfurter's concurrence, based soley on the Due Process Clause of the Fourteenth Amendment, concluded that since the first

attempt had failed because of "an innocent misadventure," id., at 470, the second would not be "Repugnant to the conscience of mankind," id., at 471, quoting Palko v. Connecticut, 302 U.S. 319, at 323 (1937). 13

Similarly, in a medical context, an inadvert failure to provide adequate medical care con not be said to constitute "an unnecessary and wanton infliction of pain" or to be [429 U.S. 97, 106] "Repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. [4]

Against this backdrop, we now consider whether respondent's complaint states a cognizable 1983 claim. The handwritten pro se' document is to be liberally construed. As the Court unanimously held in Haines v. Kerner, 404 U.S. 519 (1972), a pro se' complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id., at 520-521, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). [429 U.S. 97, 107]

Even applying these liberal standards, however, Gamble's claims against Dr. Gray, both in his capacity as treating physician and as medical director of the Corrections Department, are not cognizable under 1983. Gamble was seen by medical personnel on 17 occasions spanning a three month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. They treated his back injury, high blood pressure, and heart problem. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." Response to Pet. for Cert. 4; See also Brief for Respondent 19. The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Respondent contends that more should have been done by way

of diagnosis and treatment, and suggests a number of options that were not pursued. Id., at 17, 19. The Court of Appeals agreed, stating: "Certainly an x-ray of [Gambel's] lower back might have been in order and other test conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F. 2d, at 941. But the question whether an x-ray — or additional diagnostic techniques or forms of treatment — is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. 15 The Court of Appeals was in error in holding that the alleged insufficiency of the [429 U.S. 97, 108] medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed.

The Court of Appeals focused primarily on the alleged actions of the doctors, and did not separately consider whether the allegations against the Director of the Department of Corrections, Estelle, and the warden of the prison, Husbands, stated a cause of action. Although we reverse the judgment as to the medical director, we remand the case to the Court of Appeals to allow it an opportunity to consider, in conformity with this opinion, whether a cause of action has been stated against the other prison officials.

It is so ordered.

MR. Justice Blackmun concurs in the judgment of the court.

Footnotes

[Footnote 1] Title 42 U.S.C. 1983 provide

"Every person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any right, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in a action at law, suit in equity, or other proper proceeding for redress."

[Footnote 2]

It appears that the petitioner-defendants were not even aware of the suit until it reached the Court of Appeals. Tr. of Oral Aug 7, 13-15 This probably resulted because the District Court dismissed the complaint simultaneously with granting leave to file it in Forma Pauperis.

[Footnote 3]

His complaint states that a bale weighed "6.00 pound." The Court of Appeals interpreted this to mean 600 pound 516 F2d 937 938 (CA7 1975)

[Footnote 4]

The names and descriptions of the drugs administered to respondent are taken from his complaint. App. A-5-A-11, and his brief, at 19-20.

[Footnote 5]

There are a number of terms in the complaint whose meaning is unclear and, with no answer from the State, must remain so. For example, "administrative segregation" is never defined. The Court of Appeals deemed it the equivalent of solitary confinement. 516 F.2d, at 939. We note, however, that Gamble stated he was in "administrative segregation" when he was in the "32A-7 five building" and "32A20 five building," but when he was in "solitary confinement," he was in "3102 five building."

[Footnote 6]

The Eighth Amendment provides:

"Excessive bail shall not be Required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

At oral argument, counsel for Respondent agreed that his only claim was based on the Eighth Amendment. Tr. of Oral Arg. 42-43.

[Footnote 7]

The Amendment also proscribes punishment grossly disproportionate to the severity of the crime, Gregg v. Georgia, 428 U.S. 153, 173 (1976) (Joint opinion); Weems v. United States, 217 U.S. 349, 367 (1910), and it imposes substantive limits on what can be made criminal and punished, Robinson v. California, 370 U.S. 660 (1962). Neither of these principles is involved here.

[Footnote 8]

See, e.g., Ala. Code Tit. 45, 125 (1958); Alaska Stat. 33.30.050 (1975); Ariz. Rev. Stat. Ann. 31-201.01 (Supp. 1975);

Conn. Gen. Stat. Ann. 18-7 (1975); Ga. Code. Ann. 77-309(e) (1973); Idaho Code 20-209 (Supp. 1976); Ill. Ann. Stat. c. 38, 103-2 (1970); Ind. Ann Stat. 11-1-1.1-30.5 (1973); Kan. Stat. Ann. 75-5429 (Supp. 1975); Md. Ann. Code Art. 27 698 (1976); Mass. Ann. Laws, c. 127, 90A (1974); Mich. Stat. Ann. 14.84 (1969); Miss. Code Ann. 47-1-57 (1972); Mo. Ann. Stat. 221.120 (1962); Neb. Rev. Stat. 83-181 (1971); N.H. Rev. Stat. Ann. 619.9 (1974); N. M. Stat. Ann. 42-2-4 (1972); Tenn. Code Ann. 41-318, 41-1115, 41-1226 (1975); Utah Code Ann. 64-9-13, 64-9-19, 64-9-20, 64-9-53 (1968); Va. Code Ann. 32-81, 32-82 (1973); W. Va. Code Ann. 25-1-16 (Supp. 1976); Wyo. Stat. Ann. 18-299 (1959).

Many States have also adopted regulations which specify, in varying [429 U.S. 97, 104] degrees of detail, the standards of medical care to be provided to prisoners. See Comment, The Rights of Prisoners to Medical Care and the Implications for Drug-Dependent Prisoners and Pretrial Detainees, 42 U. Chi. L. Rev. 705, 708-709 (1975).

Model correctional legislation and proposed minimum standards are all in accord. See American Law Institute, Model Penal Code 303.4, 304.5 (1962); National Advisory Commission on Criminal Justice Standards and Goals, Standards on Rights of Offenders, Standard 2.6 (1973); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, 1 (b) (1972); National Sheriffs' Association, Standards for Inmates' Legal Rights, Right No. 3 (1974); Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners, Rules 22-26 (1955). The foregoing may all be found in U.S. Dept. of Justice, Law Enforcement Assistance Administration, Compendium of Model Correctional Legislation and Standards (2d ed. 1975).

[Footnote 9]

Spicer v. Williams, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).

[Footnote 10]

See, e.g., Williams v. Vencent, 508 F. 2d 541 (CA2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional Judgment"); Thomas v. Pate, 493 F. 2d 151, 158 (CA7), cert. denied sub nom. Thomas v. Cannon, 419 U.S. 879 (1974) (injection of penicillin with knowledge that person was allergic, and refusal of doctor to treat allergic reaction); Jones v. Lockhart, 484 F. 2d 1192 (CA8 1973) (refusal of paramedic to provide treatment); Martinez v. Mancusi, 443 F. 2d 921 (CA2 1970) cert. denied, 401 U.S. 983 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgury unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

[Footnote 11]

See, e.g., Westlake v. Lucas, 537 F.2d 857 (CA6 1976); Thomas v. Pate, supra at 158-159; Fitzke v. Shappell, 468 F.2d 1072 (CA6 1972); Hutchens v. Alabama, 466 F.2d 507 (CA5 1972); Riely v. Rhay, 407 F.2d 496 (CA9 1969); Edwards v. Duncan, 355 F.2d 993 (CA4 1966); Hughes v. Noble, 295 F.2d 495 (CA5 1961).

[Footnote 12]

See, e.g., Wilbron v. Hutto, 509 F.2d 621, 622 (CA8 1975); Campbell v. Beto, 460 F.2d 765 (CA5 1972); Martinez v. Mancusi, supra; Tolbert v. Eyman, 434 F.2d 625 (CA9 1970); Edwards v. Duncan, supra.

[Footnote 13]

He noted, however, that "a series of abortive attemps" or "a single, cruelly willful attemp" would present a different case. 329 U.S. at 471.

[Footnote 14]

The courts of Appeals are in essential agreement with this standard. All agree that mere allegation of mal practice do not state a claim, and, while there terminology regarding what is sufficient varies, their results are not inconsistent with the standard of deliberate indifference. See Page v. Sharpe, 487 F. 2d 567, 569 (CA1 1973); Williams v. Vincent, supra, at 544 (uses the phrase "deliberate indifference"); Gittlemacker v. Prasse, 428 F. 2d 1, 6 (CA3 1970); Russell v. Sheffer, 528 F. 2d 318 (CA4 1975); Newman v. Alabama, 503 F. 2d 1320, 1330 n. 14 (CA5 1974), cert. denied, 421 U.S. 948 (1975) ("callous indifference"); Westlake v. Lucas, supra, at 860 ("deliberate indifference"); Thomas v. Pate, supra, at 158; Wilbron v. Hutto, supra, at 622 ("deliberate indifference"); Tolbert v. Eyman, supra, at 626; Dewell v. Lawson, 489 F. 2d 877, 881-882 (CA10 1974).

[Footnote 15]

Tex. Rev. Civ. Stat., Art 6252-19,3 (supp. 1976). Petitioners assured the Court at argument that this statute can be used by prisoners to assert malpractice claims, Tr. of Oral Arg. 6.

[Footnote 16]

Contrary to Mr. Justice Stevens' assertion in dissent, this case signals no retreat from Haines v. Kerner, 404 U.S. 519 (1972). In contrast to the general allegations in Haines, Gamble's complaint provides a detailed factual accounting of the treatment he received. By his exhaustive description he renders speculation unnecessary. It is apparent from his complaint that he received extensive medical care and that the doctors were not indifferent to his needs.

MR. Justice Stevens, dissenting.

Most of what is said in the Court's opinion is entirely consistent with the way the lower federal courts have been processing claims that the medical treatment of prison inmates is so inadequate as to constitute the cruel and unusual punishment prohibited by the Eighth Amendment. I have no serious disagreement with the way this area of the law has developed thus far, or with the probable impact of this opinion. Nevertheless, there are three reasons why I am unable to Join it. First, insofar as the opinion orders the dismissal of the complaint against the chief medical [429 U.S. 97, 109] officer of the prison, it is not faithful to the rule normally applied in construing the allegations in a pleading prepared by an uncounseled inmate. Second, it does not adequately explain why the Court granted certiorari in this case.

Third, it describes the State's duty to provide adequate medical care to inmates in ambiguous terms which incorrectly relate to the subjective motivation of persons accused of violating the Eighth Amendment rather than to the standard of care required by the constitution.

I

The complaint represents a crude attempt to challenge the system of administering medical care in the prison where Gamble is confined. Fairly construed, the complaint alleges that he received a serious disabling back injury in November 1973, that the responsible prison authorities were indifferent to his medical needs, and that as a result of that indifference he has been mistreated and his condition has worsened.

The indifference is allegedly manifested, not merely by the

failure or refusal to diagnose and treat his injury properly, but also by the conduct of the prison staff. Gamble was placed in solitary confinement for prolonged periods as punishment for refusing to preform assigned work which he was physically unable to preform. 1  The only medical evidence presented to the disciplinary committee was the statement of a medical assistant that he was in first-class condition, when in fact [429 U.S. 97, 110] to permit him to sleep in the bunk that a doctor had assigned. On at least one occasion a medical prescription was not filled for four days because it was lost by staff personnel. When he suffered chest pains and blackouts while in solitary, he was forced to wait 12 hours to see a doctor because clearence had to be obtained from the warden. His complaint also draws into question the character of the attention he received from the doctors and the inmate nurse in response to his 17 attempts

to obtain PROPER diagnosis and treatment for his condition. How-EVER, apart from the medical director who saw him twice, he has not sued any of the individuals who saw him on these occasions. In short, he com-plains that the systems as a whole is inadequate.

On the basis of Gamble's handwritten complaint it is impossible to assess the quality of the medical attention he RECEIVED. As the Court points out, even if what he alleges is true, the doctors may be guilty of noth-ing more than negligence or malpractice. On the other hand, it is surely not incon-ceivable that an overworked, underman-ned medical staff in a crowed prison 2 is following the expedient course of rou-tinely prescribing nothing more than pain killers when a thorough diagnosis would disclose an obvious need for Re-medical treatment. 3 Three fine Judges [429 U.S. 97, 111] sitting on the United States Court of Appeals for the Fifth Circuit 4 thought that enough had been

alleged to REQUIRE some inquiry into the actual facts. If this Court meant what it said in Haines v. KERNER, 404 U.S. 519, these Judges were clearly Right. 5 [429 U.S. 97, 112]

The Haines test is not whether the facts alleged in the complaint would entitle the plaintiff to Relief. Rather, it is whether the Court can say with assurance on the basis of the complaint that, beyond any doubt, no set of facts could be proved that would entitle the plaintiff to relief. 6 The Reasons for the Haines test are manifest. A pro se complaint provides an unsatisfactory foundation for deciding the merits of important questions because typically it is inartfully drawn, unclear, and equivocal, and because through pleadings, affidavits and possibly an evidentiary hearing will usually bring out facts which simplify or make unnecessary the decision of questions presented by the naked complaint. 7 [429 U.S. 97, 113]

Admittedly, it is tempting to eliminate the meritless complaint at the pleading stage. Unfortunately, this "is another instance of Judicial haste which in the long Run makes waste," Dioguardi v. During, 139 F.2d 744, 775 (CA2 1944) (Clark, J.) cited with approval in Haines v. Kerner, supra, at 521. In the instant case, if the District Court had Resisted the temptation of premature dismissal, the case might long since have ended with the filing of medical Records or affidavits demonstrating adequate treatment. Likewise, if the decision of the Fifth Circuit Reinstating the complaint had been allowed to stand and the case had Run its normal course, the litigation probably would have come to an end without the need for Review by this Court. Even if the Fifth Circuit had wrongly decided the pleading issue, no great harm would have been done by Requiring the state to produce its medical Records and move for summary Judgment. Instead, the case has been prolonged by two stages of appellate Review, and is still not over: The case against two of the prison doctors have not been disposed of with finality. 8

The principal beneficiaries of today's decision will not be federal judges, very little of whose time will be saved, but rather the "writ-writers" within the prison walls, whose semiprofessional to embellish this pleading with conclusory allegation which could be made in all good faith and which would foreclose a dismissal without any response from the state. It is unfortunate that today's decision will increase prisoners' dependence on those writ-writers, see Cruz v. Beto, 405 U.S. 319, 327 n. 7 (Rehnquist, J., dissenting).

## II

Like the District Court's decision to dismiss the complaint, this Court's decision to hear this case, in violation of its normal practice of denying interlocutory review, see [429 U.S. 97, 115] R. Stern & E. Gressman, Supreme Court Practice 180 (4th ed. 1969), ill serves the interest of judicial economy.

Frankly, I was, and still am, puzzled by the Courts decision to grant certiorari.[9] If the Court merely thought the Fifth Circuit misapplied Haines v. Kerner by reading the complaint too liberally, the grant of certiorari is inexplicable. On the other hand, if the Court thought that instead of a pleading question, the case presented an important constitutional question about the State's duty to provide medical care to prisoners, the crude allegations of this complaint do not provide the kind of factual basis[10] the Court normally requires as a predicate for the adjudication of a novel and serious constitutional issue, see, e.g., Rescue Army v. Municipal Court, 331 U.S. 549, 568-575; Ellis v. Dixon, 349 U.S. 458, 464; Wainwright v. City of New Orleans, 392 U.S. 598 (Harlan, J., concurring).[11] Moreover, as the Court notes, all the Courts of Appeals to consider the question have reached substantially the same conclusion that the Court adopts. Ante, at 106 n. 14. Since the Court seldom takes a case merely to readirm settled law, I fail to understand

why it has chosen to make this case an exception to its normal practice. [429 U.S. 97, 116]

### III

By its reference to the accidental character of the first unsuccessful attempt to electrocute the prisoner in Louisiana ex rel. Francis v. Reweber, 329 U.S. 459, see ante, at 105, and by its repeated references to "deliberate indifference" and the "intentional" denial of adequate medical care, I believe the Court improperly attaches significance to the subjective motivation of the defendant as a criterion for determining whether cruel and unusual punishment has been inflicted.[12] Subjective motivation may well determine what, if any, remedy is appropriate against a particular defendant. However, whether the constitutional standard has been violated should turn on the character of the punishment rather than the motivation of the individual who inflicted it.[13] Whether the conditions in Andersonville were the

[429 U.S. 97, 117] product of design, negligence, or mere poverty, they were cruel and inhuman.

In sum, I remain convinced that the petition for certiorari should have been denied. It having been granted, I would affirm the judgment of the Court of Appeals.

[Footnote 1]

In his complaint, Gamble alleged that he had been placed in administrative segregation and remained there through December and January. At the end of January he was placed in solitary confinement. In an affidavit filed in the Court of Appeals the following December, see n. 8, infra, Gamble alleged that with the exception of one day in which he was taken out of solitary to be brought before the disciplinary committee, he had remained in solitary up to the date of the affidavit.

[Footnote 2]

According to a state legislative report quoted by the Court of Appeals, the Texas Department of Corrections has had at various times one to three doctors to care for 17,000 inmates with occasional part-time help. 516 F.2d 934, 940-941, n.1 (1975).

[Footnote 3]

This poorly drafted complaint attempts to describe conditions which resemble those reported in other prison systems. For instance, a study of the Pennsylvania prison system reported:

"When ill, the prisoner's point of contact with a prison's health care program is the sick-call line. Access may be barred by a guard, who refuses to give the convict a hospital pass out of whimsy or prejudice, or in light of a history of undiagnosed complaints. At sick-call the convict commonly first sees a civilian

paraprofessional or a nurse, who may treat the case with a placebo without actual examination, history-taking or recorded diagnosis. Even seeing the doctor at some prisons produce no [429 U.S. 97, 111] more than aspirin for symptoms, such as dizziness and fainting, which have persisted for years." Health Law Project, University of Pennsylvania, Health Care and Conditions in Pennsylvania's State Prisons, in American Bar Association Commission on Correctional Facilities and Services, Medical Health Care in Jails, Prisons, and Other Correctional Facilities: A Compilation of Standards and Materials 71, 81-82 (Aug. 1974).

A legislative report on California prisons found:

"By far, the area with the greatest problem at the hospital [at one major prison], and perhaps at all the hospitals, was that of the abusive doctor-patient relationship. Although the indifference of M.T.A.'s

[Medical Technical Assistants] toward medical complaints by inmates is not unique at Folsom, and has been reported continuously elsewhere, the calloused and frequently hostile attitude exhibited by the doctors is uniquely reprehensible....

"Typical complaints against [one doctor] were that he would ... not adequately diagnose or treat a patient who was a disciplinary problem at the prison, ...." Assembly Select Committee on Prison Reform and Rehabilitation, An examination of California's Prison Hospitals, 60-61 (1972).

These statements by responsible observers demonstrate that it is far from fanciful to read a prisoner's complaint as alleging that only pro forma treatment was provided.

[Footnote 4]

The panel included Mr. Justice Clark, a retired member of this Court, sitting by designation, and Circuit Judges Goldberg and Ainsworth.

[Footnote 5]

In Haines a unanimous Supreme Court admonished the federal Judiciary to be especially solicitous of the problems of the uneducated inmate seeking to litigate on his own behalf. The Court said:

"Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We can not say with assurance that under the allegations of a pro se' complaint, which we hold to a less stringent standards than formal pleadings drafted by lawyers, it appears 'beyond doubt' that the plaintiff can prove no set of facts in support of [429 U.S. 97, 112] his claim, which would entitle him to Relief.' Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See Dioguardi

Under that test the complaint should not have been dismissed without, at the very minimum, requiring some response from the defendants. It appears from the records that although the complaint was filed in February, instead of causing it to be served on the defendants as required by Fed. Rule Civ. Proc. 4, the Clerk of District Court referred it to a magistrate who decided in June that the case should be dismissed before any of the normal procedures were even commenced. At least one Circuit has held that dismissal without service on the defendants is improper, Nichols v. Schubert, 499 F2d 946 (CA7 1974). The Courts disposition of this case should not be taken as an endorsement of this practice since the question was not raised by the parties.

[Footnote 6]

This is the test actually applied in Haines, for although the Court ordered the complaint reinstated, it expressly "intimate[d] no view whatever on the merits of

petitioner's allegations," 404 U.S., at 521. It is significant that the Court took this approach despite being pressed by the State to decide the merits. As in this case, the State argued forcefully that the facts alleged in the complaint did not amount to a constitutional violation. (Only in one footnote in its 51-page brief did the State discuss the pleading question, Brief for Respondents 22-23, n. 20, in No. 70-5025, O.T. 1971.) Yet, this Court devoted not a single word of its opinion to answering the argument that no constitutional violation was alleged.

[Footnote 7]

Thus, Haines teaches that the decision on the merits of the complaint [429 U.S. 97, 113] should normally be postponed until the facts have been ascertained. The same approach was taken in Polk v. Glover, 305 U.S. 5, in which the Court reversed the dismissal of a complaint, without intimating any view of the constitutional issues, on "[t]he salutary

principle that the essential facts should be determined before passing upon grave constitutional questions...." Id., at 10. See also Borden's Co. v. Baldwin, 293 U.S. 194, 213 (Cardozo and Stone, JJ., concurring in result). This approach potentially avoids the necessity of ever deciding the constitutional issue since the facts as proved may remove any constitutional question. Alternatively, a more concrete record will be available on which to decide the constitutional issues. See generally Rescue Army v. Municipal Court, 331 U.S. 549, 574-575. Even when constitutional principles are not involved, it is important that "the conceptual legal theories be explored and assayed in the light of actual facts, not as a pleader's supposition," so that courts may avoid "elucidating legal responsibilities as to facts which may never be." Shull v. Piolot Life Ins. Co., 313 F.2d 445, 447 (CA5 1963).

[Footnote 8]

In an affidavit filed in the Court of Appeals, Gamble states the he has been transferred to another prison, placed in solitary confinement, and denied any medical care at all. These conditions allegedly were continuing on December 3, 1974, the date of the affidavit. The Court of Appeals apparently considered these allegations, as shown by a reference to "the fact that [Gamble] has spent months in solitary confinement without medical care and stands a good chance of remaining that way without intervention," 516 F.2d at 941. Presumably the Courts remand does not bar Gamble from pursuing these charges, if necessary through filing a new complaint or formal amendment of the present complaint. The original complaint also alleged that prison officials failed to comply with a doctor's order to move Gamble to a lower bunk, that they put him in solitary confinement when he claimed to be physically able to work, and that they refused to allow him to see a doctor for

two days while he was in solitary. Gamble's medical condition is Relevant to all these allegations. It is therefore probable that the medical Records will be produced and that testimony will be elicited about Gamble's medical caRe. If the evidence should show that he in fact sustained a serious injury and Received only pro forma care, he would surely be allowed to amend his pleading to Reassert a claim against one or more of the prison doctors.

[Footnote 9

The only Remarkable thing about this case is its presence in this Court. For the case involves no more than the application of well-settled principles to a familiar situation, and his little significance except for the Respondent. Why certiorari was granted is a mystery to me—particularly at a time when the Court is thought by many to be burdened by too heavy a caseload." Butz V. Glover Livestock Comm'n Co. 411 U.S. 182, 189

[Footnote 10]

As this Court notes, ante, at 100 n. 5, even the meaning of some of the terms used in the complaint is unclear.

[Footnote 11]

If this was the reason for granting certiorari, the writ should have been dismissed as improvidently granted when it became clear at oral argument that the parties agreed on the constitutional standard and disagreed only as to its application to the allegations of this particular complaint. See Tr. of Oral Arg. 38, 48.

[Footnote 12]

As the four dissenting Justices in Resweber pointed out:

"The intent of the executioner cannot lessen the torture or excuse the result. It was statutory duty of the

State officials to make sure that there was no failure." 329 U.S., at 477 (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ.).

[Footnote 13]

The Court indicates the Eighth Amendment is violated "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Ante, at 104-105. If this is meant to indicate that intent is a necessary part of an Eighth Amendment violation, I disagree. If a State elects to impose imprisonment as a punishment for crime, I believe it has an obligation to provide the persons in its custody with a health care system which meets minimal standards of adequacy. As a part of that basic obligation, the State and its agents have an affirmative duty to provide reasonable access to medical care, to provide competent,

diligent medical personnel, and to ensure that prescribed care is in fact delivered. For denial of medical care is surely not part of the punishment which civilized nations may impose for crime.

Of course, not every instance of improper health care violates the Eighth Amendment. Like the rest of us, prisoners must take the risk that a competent, diligent physician will make an error. Such an error may give rise to a tort claim but not necessarily to a constitutional claim. But when the state adds to this risk, as by providing a physician who [429 U.S. 97, 117] does not meet minimum standards of competence or diligence or who cannot give adequate care because of an excessive caseload or inadequate facilities then the prisoner may suffer from a breach of the State's constitutional duty. [429 U.S. 97, 118]

part of 1

# In The United States District Court for the Middle District of Pennsylvania

# Civil Action

# Case No.

_____

# Case Law

Mandel v. Doe

No. 88 - 3575

11th - Cir

RE: Physician acting a final policy-maker for county with respect to medical affairs at county prison.

Mandel v. Doe
No. 88 - 3575
(11th Cir. 1989)
Escambia Co.
Florida

PRISONER brought Civil Rights action
under § 1983 against county, alleging
he was injured by physician assistant's
deliberate indifference to his serious
medical needs while he was a prisoner
a county road prison. The United States
District Court for the Northern District
of Florida, No. PCA 86 - 4162 WEA, Winston
E. Arnow, J., rendered judgment for the
prisoner on jury verdict and awarded
500,000 damages, and county appealed.
The Court of Appeals, Anderson, Circuit
Judge, held that: (1.) evidence established
that physician's assistant's treatment
of prisoner after he injured his leg
constituted deliberate indifference
to prisoner's serious medical needs, and
(2.) evidence established that physician's
assistant was acting as final policymaker
for county with respect to medical affairs

## 4.) Civil Rights - 242 (5)

Evidence established deliberate indifference by physician's assistant charged with medical treatment of Road Prison inmates, for purposes of civil Rights claim under § 1983; prisoner had serious medical needs once he injured his leg while Jumping off truck bed, physician's assistant's knowledge of need for medical care was conclusively established, but Physician's assistant never apprised his superior, a medical doctor, of the prisoner's situation, obtained an x-Ray of the prisoner's leg, or had the prisoner examined by a doctor or taken to a hospital, despite repeated requests by the prisoner and his parents directed toward the physician's assistant and prison superintendent.

42 U.S.C.A. § 1983

5.) Civil Rights 242(5)

Absent evidence of conscious or callous indifference to prisoner's rights, mere fact of inmates injury is insufficient to state claim of deliberate indifference.

6.) Prisons - 17(2)

When need for treatment is obvious, medical care for prisoners which is so cursory as to amount to no treatment at all may amount to deliberate indifference.

7.) Civil Rights - 205(1), 206(3)

Civil Rights liability under § 1983 may not be premised solely upon Respondeat superior theory; i.e., county may not be held liable solely by virtue of employment relationship linking it to offending employee, but rather, only deprivations undertaken pursuant to government custom

OR policy may lead to imposition of government liability.

42 U.S.C.A. § 1983

8.) Civil Rights - 206(3)

Civil Rights liability may be imposed on municipality under § 1983 for single decision by municipal policymaker under certain circumstances.

42 U.S.C.A. § 1983

9.) Civil Rights - 206(3)

Municipal liability may attach under § 1983 to single decision made by municipal official if that municipal official is final policymaker for municipality with respect to the subject matter in question.

42 U.S.C.A. § 1983

1.) Criminal Law - 1213.10(3)

MERE negligence in medical treatment of PRISONER OR medical mal-practice is not sufficient to violate Eighth Amendment proscription against cruel and unusual punishment. U.S.C.A. Const. Amend. 8.

2.) Prisons - 17(2)

State has constitutional obligation to provide adequate medical care to those whom it has incarcerated.

3.) Criminal Law - 1213.10(3)

In determining whether medical care received by prisoner violates Eight Amendment proscription against cruel and unusual punishment, it must first be evaluated whether there was evidence of serious medical need, and if there was, then considered wh-ether response to that need amounted to deliberate indifference.

5 U.S.C.A. Const. Amend. 8

10.) Civil Rights - 206(3)

When § 1983 liability on part of municipality is to attach based on single decision made by municipal official if that municipal official is final policy maker for municipality with respect to the subject matter in question, first inquiry is to identify those individuals whose decisions represent official policy of local government unit.

42 U.S.C.A. § 1983

11.) Civil Rights - 244

Identification of those individuals whose decisions represent offical policy of local government unit and will support imposition of § 1983 liability on municipality presents question of law to be resolved by trial court Judge.

42 U.S.C.A. § 1983

12.) Civil Rights - 206 (3)

In determining whose decisions represent official policy of local government unit, so as to support imposition of § 1983 liability on municipality, court should examine not only relevant positive law, including ordinances, rules, and regulations, but also relevant customs and practices having force of law.

42 U.S.C.A. § 1983

13.) Civil Rights - 206 (3)

In determining whose decision represent official policy of local government unit, so as to support imposition of § 1983 liability on municipality, court must ensure that the official possesses authority and responsibility for establishing "final" policy with the respect to the issue in question.

42 U.S.C.A. § 1983

## 14.) Civil Rights - 206(3)

Physician's assistant was acting as final policymaker for county with respect to medical affairs at Road Prison, for purposes of imposing § 1983 liability based on deliberate indifference he displayed to prisoner's medical needs.

## 42 U.S.C.A. § 1983

## 15.) Federal Courts - 617

County had effectively abandoned issue of whether conclusion that final policymaking authority was delegated to physician's assistant with respect to medical affairs of Road Prison was erroneous, for purposes of § 1983 action; notwithstanding clear statement by district judge, it was for isolated incident, and on appeal county had continued to argue only that theory and failed to address delegation issue.

Before Vance and Anderson, Circuit Judges, and Atkins*, Senior District Judge.

Anderson, Circuit Judge:

Appellee George Mandel brought this §1983 action against Escambia County ("County"), contending that he had been injured by a physician assistant's deliberate indifference to his serious medical needs during his tenure as an inmate at a county road prison. The district court entered judgment for Mandel on a jury verdict and damage award of $500,000. The County appeals, arguing that the district court erred in directing a verdict for plaintiff on the issue of municipal liability and in denying the Count's directed verdict motions as to that question and deliberate indifference. We conclude that the district court's rulings on the directed verdict motions were correct. We thus affirm the judgment of the

## I. FACTS

In October 1981, Escambia County initiated a program to provide medical care to inmate at its Road Prison. County Road Camp No. 5, in Cantonment, Florida. As provided in a Memorandum of Understanding between the County and the County Health Department, a physician's assistant was to be located at the Road Prison to provide medical care to the inmates. Pursuant to this memorandum, physician's assistant Richard Hatfield was placed at the prison to provide medical care. Although it was originally contemplated that the physician's assistant would be supervised by a medical doctor, a custom and practice devoloped that Hatfield was subject to no supervision or review at all.

George Mandel was lawfully incarcerated at the Road Prison from June 1 to September 13, 1982. On July 1, 1982, Mandel jumped off the

bed of a work crew pickup truck, landed on his left leg and immediately felt a sharp pain in his left leg and hip.

Two days later, on July 3, 1982, Mandel sought treatment for his injury by filing the required medical request form with the physician's assistant, Richard Hatfield.[1] Hatfield did not see Mandel until July 18. At that time Mandel told Hatfield that something "Real Bad" was wrong with his leg and requested that an X-Ray be performed. Hatfield failed to perform an X-Ray or to provide any other treatment on this first visit.[2] Mandel filed with Hatfield another written request for treatment on July 19. He was not examined by Hatfield following this request.

(1.) Mandel requested treatment both for his leg injury and for an unrelated skin rash condition.

(2.) Mandel was givin some cream for his skin rash.

On July 20 as Mandel was waiting at the Road Prison to be called to work, his left leg collapsed under him. A Road Prison guard, Captain Mike Holland, witnessed this event. Upon learning of Mandel's prior injury and his unsuccessful attempts to secure treatment, the guard told Mandel to submit another medical Request form, and that he would ensure Mandel was seen by the physician's assistant. That day Mandel filed a third written Request for treatment in which he stated that it was hard to walk because every step hurt

On July 23, Hatfield examined Mandel, who entered Hatfield's office draging his left leg, informed Hatfield that he could not walk on his left leg or put any pressure on his left side of his body. Hatfield diagnosed Mandel's problem as inflammation of the bone and prescribed Motrin and five days of bed Rest.

Mandel asked to see a doctor or to be sent to a hospital to have x-rays performed. Hatfield refused both requests, saying that he was a doctor.

On July 28, Hatfield visited Mandel in a large dormitory where he had been resting. Mandel complained that his leg was worsening - that he could barely stand on it - and again requested an x-ray. Hatfield did not examine Mandel, but ordered that he be placed in an isolated cell six feet by eight feet, with no sink or toilet. No explaination was offered for this transfer. After he was placed in the cell, Mandel's condition continued to deteriorate to the point where he could walk only by holding onto something or trying to skip so as not to place any weight on the affected leg.

Hatfield examined Mandel on August 2, and diagnosed his condition as muscle inflammation. Once again Mandel asked to be sent to a hospital for x-rays, and his request was again denied on the grounds that Hatfield was a doctor. Hatfield gave Mandel aspirin and asked whether he wanted to return to work. To avoid having to return to his six by eight cell, Mandel responded affirmatively and was released to work. From the time the were notified of his injury a day or two after it occurred, Mandel's parents visited him at the road prison on a weekly basis. Mandel's mother kept apprised of his condition through Mandel, other inmates, guards and her own observations.

(3.) Mrs. Mandel described her visit the first Sunday after his injury as follows:

Well, we had to sit on a thing like a ramp or a porch on the side of the building, and as he came out the door where they search them as they came

<u>Con't</u>

(3) out, well he was dragging his leg and he couldn't hardly walk, so I got up and went and he held around me me and walked, to the place where we were seated.

R8:241

Within two weeks of the injury, Mrs. Mandel called Hatfield, under the assumption that he was a doctor, to ask about her son's condition and to request that he be taken to an emergency room to have x-rays taken. Hatfield said it wa not necessary to take x-rays.

The following week, after learning that Hatfield was not a doctor, Mrs. Mandel drove to the prison to ask that her son be taken to a private doctor or an emergency room, and offered to pay for such treatment. At a meeting with Hatfield and prison superintendent Elliott, both Elliott and Hatfield laughed in response to Mrs. Mandel's request, and Elliott asked,

"Do you always run interference for your son?"

Shortly after that meeting, on August 3, Hatfield again examined Mandel. Hatfield observed that Mandel was virtually unable to walk, but again refused Mandel's request for x-rays, commenting that his mother was offering "interference" for him. Hatfield gave Mandel a muscle relaxant, and placed him back in the six-by-eight cell. Mandel took the prescribed muscle relaxant and stayed in bed, but experienced no improvement. Mandel continued to complain of his condition to Hatfield and to request additional treatment, but was never again examined by him.

After her disappointing meeting with Hatfield and Elliott, Mrs. Mandel and her husband made an appointment with Kenneth Kelson, Chairman of the Board of Commissioners for Escambia County. At that meeting

MR. and MRS. Mandel explained the the circumstances of Mandel's injury and Hatfield's refusal to send Mandel to be examined by a doctor. Chairman Kelson told the Mandel's that he would try to get their son out of the six-by-eight cell and to secure some treatment for his injury.

Following the meeting, Chairman Kelson sent the County Administrator, Rodney Kendig, to the road prison. Kendig was successful in securing Mandel's immediate release from the cell back into the general population. However, Mandel did not receive any medical care following Kendig's intervention - no X-rays were preformed, and he was not brought to see a doctor.

In a subsequent conversation with Mandel's father, Kelson said "that as far as doing anything about the medical aspect of the case that.... he had no authority whatsoever to butt into the enternal affairs or any of the workings of the county government and specifically

the county Road camp."

On August 10, Mandel Returned to work with the authorization of Hatfield. Mandel's Road crew captain gave him light work to perform, such as Raking dirt. Mandel continued to Request medical care from Hatfield and other personnel at the Road prison, and Hatfield told Mandel that he would never Receive an X-Ray for his leg. Mrs. Mandel also Repeatedly asked Hatfield that her son be taken to an emergency Room or seen by a private physician, at her exspence! Her Requests were all denied.

Mandel was Released from the county Road prison in September 1982, upon completion of his sentence. At the time of his Release, Mandel was unable to walk.

Shortly after his Release Mandel was examined by Dr. Leo Flynn, a Board-certified orthopedic surgen. Dr Flynn took x-Rays and determined that Mandel had sustained a fracture

OR CRACK in the Round part of the hip Joint when he Jumped off the truck. According to Dr. Flynn, the failure to perform surgery following the fracture caused a collapse of the roundness of the bone and made necessary a complete prosthetic hip Joint Replacement, including both the ball and socket.

Mandel filed this action pursuant to 42 U.S.C § 1983, alleging that he had suffered permanent physical impairment as a result of the deliberate indifference of the County officials in violation of the Eighth Amendment. Following the dismissal by stipulation of all individual defendants, the sole defendant at trial was Escambia County. At the close of plaintiff's case, the County moved for a directed verdict on the issues of deliberate indifference and municipal liability. The motion was denied. At the close of all the evidence, the district court denied another

motion for directed verdicted by the County and granted, over defendant's objection, Mandel's motion for directed verdict on the question of Monell liability. The jury returned a verdict in favor of Mandel in the amount of $500,000. Following entry of judgment, the court denied defendant's motion for judgment notwithstanding the verdict or in the alternative for a new trial. The County timely appealed from the final judgment.

The County argues that the district court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict on the question of weather Hatfield's treatment constituted deliberate indifference to Mandel's serious medical needs. The County contends that the evidence, taken in the light most favorable to the plaintiff, shows no more than a denile of Mandel's requests for an x-ray. Therefore, the County maintains that the deliberate indifference issue in this case is controlled

by Estelle v. Gamble, 429 U.S. 97 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976 which found that the failure to order an x-Ray did not by itself amount to deliberate indifference. The RECORD in this case, however, is REPLETE with evidence of serious medical need, grossly deficient treatment, and callous indifference. Accordingly, we conclude that the district court was correct in denying the County's motion for directed verdict on the issue.

(1,2) The Supreme Court has held that the Eighth Amendment proscription against cruel and unusual punishment "does not permit prison personnel to subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. at 106, 97 S.Ct. at 292. In articulating the scope of this Right, the Court has warned that not "every claim by

"Every claim by a prisoner that he has not received adequate medical treatment states a [constitutional] violation." 429 U.S. at 105, 97 S.Ct. at 291. Mere negligence or medical malpractice is not sufficient. See West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 2255 n. 8, 101 L.Ed. 2d 40 (1988); Estelle, 429 U.S. at 105-06, 97 S.Ct. at 292. However, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle, 429 U.S. at 103, 97 S.Ct. at 290. Thus the state has a constitutional obligation to provide adequate medical care to those whom it has incarcerated. Id. See also West v. Atkins, 487 U.S. at ___, 108 S.Ct. at 2258. Accordingly, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983." Estelle, 429 U.S. at 105, 97 S. Ct. at 291.

[3.] Our analysis has two components. First, we must evaluate whether there was evidence of a serious medical need; if so, we must then consider whether Hatfield's response to that need amounted to deliberate indifference. See West v Keve, 571 F. 2d 158, 161 (3rd Cir. 1978) ("Deliberate indifference" standard is "two-pronged. It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious").

[4.] On appeal the County does not dispute the severity of Mandel's medical needs. Moreover, it is clear upon examination of the record that Mandel had serious medical needs. During Mandel's first visit with Hatfield, on July 18, Mandel related that something "real bad" was wrong with his leg. Two days latter, a road prison guard witnessed Mandel's leg collapse under him, which prompted

23B

the guard to recommend the submission of another written request for treatment. Mandel's third written request stated that he found it hard to walk, as every step hurt. On July 23, Hatfield examined Mandel and observed him dragging his leg behind him as he entered the office. On July 28, when Hatfield visited Mandel, Mandel complained that his leg was worsening, as he could barely stand on it. At another examination, Hatfield observed that Mandel was virtually unable to walk, and that Mandel screamed in pain when Hatfield moved his injured leg. Mandel continued to complain to Hatfield of his deteriorating condition until his release. This evidence supports the jury's conclusion that Mandel had established a serious need for medical care after his injury. See Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. (1988) (medical needs of inmates need not be considered "life threatening" to be considered serious under

Estelle). See also Aldridge v. Montgomery, 753 F.2d 970, 973 (11th Cir. 1985).

[5] Absent evidence of "'conscious or callous indifference to a prisoner's rights,'" the mere fact of an inmate's injury is insufficient to state a claim of deliberate indifference. Zatler v. Wainright, 802 F.2d 397, 400 (11th Cir. 1986) quoting Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L. Ed. 2d 305 (1983). We now turn to a consideration of Hatfield's response to Mondel's serious medical needs.

This court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference. See Carswell v. Bay County, 854 F.2d 454, 457 (11th Cir. 1988); Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985); Fielder v. Bosshard, 590 F.2d 105, 108 (5th Cir. 1979).

In many RESPECTS, the fact of this case parallel the finding of deliberate indifference upheld in Carswell. There, an inmate in a county jail suffered from skin rash, constipation and significant weight loss. This court held that the fact that two jail personnel told the physician's assistant of the inmate's serious situation established the assistant's knowledge of the inmate's need for medical attention. Because the evidence established that the assistant failed to advise the supervising physician of the inmates condition and that the jail administrator failed to respond to specific requests for the attention of a doctor made by the inmate and a public deffender, this court concluded that a reasonable jury could conclude that the failure to provide medical care constituted deliberate indifference.

Similarly, in the instant case, the fact that a prison guard saw Mandel collapse and intervened on his behalf to secure an appointment with Hatfield, coupled with Hatfield's observation of Mandel's pain and his dragging of the affected leg, conclusively established Hatfield's knowledge of the need for medical care. In spite of this knowledge, however, Hatfield never took the appropriate measures to ensure that Mandel received adequate treatment.

Indeed, the evidence here is much more demonstrative of deliberate indifference than that shown in Carswell. The evidence indicates that Hatfield exhibited complete indifference to Mandel's worsening condition. Hatfield callously and cavalierly ignored repeated indications from Mandel and his parents that the patients condition was far more serious than his two different diagnoses - bone inflamation and muscle inflamation -

Mandel had to wait fifteen days after submitting his first Request for treatment before even seeing Hatfield. Only after three Requests had been filed, twenty days had passed, and a prison guard (who had witnessed Mandel's leg collapse) had intervened on Mandel's behalf, did Hatfield conduct an extensive examination, offer his first diagnosis and prescribe any form of medication and treatment. Hatfield saw Mandel dragging his leg behind him on more than one occasion, and he conducted an examination in which he watched Mandel scream in pain from the movement of his injured leg. In response to mounting evidence that the injured leg was not improving, and, indeed, was deteriorating, Hatfield refused to allow Mandel to see a doctor or to go to a hospital. Hatfield refused to perform an x-ray of the injured leg and stated that he would never order an x-ray. During the course of treatment Hatfield twice ordered that Mandel be removed from the general population and placed

in an isolated six-by-eight cell with no water or toilet facilities. Finally, when Mandel's mother, concerned that her son was not receiving even rudimentary care, asked that her son be seen by a doctor, Hatfield at her and reiterated his refusal.

[6] Thus, the evidence clearly established that despite repeated request by both Mandel and his parents directed at Hatfield and Prison superintendent Elliott, Hatfield never apprised his superior, Dr. Putnam, of Mandel's situation, obtained an x-ray on Mandel's leg, or had Mandel either examined by a doctor or taken to a hospital. When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference. See Ancata V. Prison Health Services, Inc., 769 F.2d at 704 (medical care of pretrial detainee which is so cursory as to amount to no treatment at all may violate the Fourteenth Amendment;

West v. Keve, 571 F.2d at 162 (although inmate who alleged post-operative pain in his leg had been provided with asprin, "this may not constitute adequate medical care").

In addition, there exists evidence that Hatfield had previously exhibited deliberate indifference in carrying out his responsibilites as physician's assistant. In January or Febuary, 1982, shortly before Mandel's arrival at the road prison, Hatfield bragged to another County physician's assistant, James Grider, Jr., that in order to teach a patient a lesson for forcing him to come out to the prison to render medical care after normal hours, he had restricted a sick inmate to an isolation cell without smoking privileges. Mr. Grider testified that "it bothered him [i.e. Hatfield] that he had to come out there [in order to provide treatment] eventhough that was the rule that he had set up with the working staff out at road camp that if any medical problems came up he was to be notified."
Grider brought these incidents to the attention of Dr. Putnam,

who then went upstairs to report the matter to the director of the County Health Department. Upon coming back downstairs, Dr. Putnam told Grider: "Well, that's the way it is, we'll just have to work with it."

Furthermore, evidence was presented that Hatfield had in the past inflicted unnecessary pain on a patient in his care. David Burson, a physician's assistant at the Road Prison who trained under Hatfield between the summer of 1982 and May, 1983, testified to an incident which occurred in August or September of 1982: There was one inmate that came in, had an abscess under his arm ... it was after sick call hours and Mr. Hatfield was a little upset, but he brought him in and he was examining him and he reached up under his arm and squeezed, and that upset me ... I believe that he was causing the inmate unnecessary pain and that he could have made the diagnosis without that.

Finally, Mandel offered expert evidence that the treatment afforded him failed to meet appropriate professional standards. Cf. Hamm v. Dekalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (finding no deliberate indifference where inmate was seen by physician and psychiatrist, and where there was no evidence that medical treatment he received fell short of appropriate professional standards), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed. 2d 894 (1986). Dr. Flynn, Mandel's orthopedic surgeon, testified in a video deposition played before the Jury that the delay in properly diagnosing the hip injury deprived Mandel of one treatment option, bone grafting, which might have been pursued had the injury been timely treated. Flynn testified that had Mandle been correctly examined and his hip fracture quickly recognized, it might have been possible to treat the fracture prior to the collapse of the ball in the hip joint. According to Flynn, it was probable that the hip ball collapsed gradually in the aftermath

of the fracture. As a result, by the the time a correct diagnosis of Mandel's injury was conducted after he had left the prison, it was necessary to complete replace the hip joint.

As a physician's assistant, Hatfield could not have been expected to diagnose correctly every medical problem brought to his attention. However, his persistent refusal to order an x-ray, or to refer Mandel to a doctor or a hospital for more experienced and knowledgeable treatment, coupled with his utter lack of concern for the well-being of an inmate with whose care he had be entrusted, constitutes precisely the deliberate indifference not tolerated by the Constitution. Accordingly, we conclude that the district court properly denied the County's motion for directed verdict on the issue of deliberate indifference.

33. B

## III. County Liability
## Policy or custom

Having determined that the district court was correct in denying the County's motion for directed verdict as to deliberate indifference, we now proceed to the question of whether that indifference was a product of policy or custom for which the County can be held liable. The County argues that the district court erred both in denying its motion for directed verdict on this issue, and in granting Mandel's directed verdict motion. We address the court's ruling on each motion in ture.

## A. Grant of Plaintiff's
## Directed Verdict Motion

[7] A local government is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...."

*Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978). See also *Geter v. Wille*, 846 F.2d 1352, 1354 (11th Cir. 1988), cert. denied, ___ U.S. ___, 109 S. Ct. 870, 102 L. Ed. 2d 994 (1989). Section 1983 liability may not be premised solely upon a respondeat superior theory - i.e., a county may not be held liable solely by virtue of the employment relationship linking it to the offending employee. Rather, only deprivations undertaken pursuant to governmental "custom" or "policy" may lead to the imposition of government liability. "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' - that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298 89 L. Ed. 2d 452 (1986). See *City of Canton v. Harris*, ___ U.S. ___, ___, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989) ("a municipality can be found liable under § 1983 only where

the municipality itself causes the constitutional violation at issue") (emphasis in original).

The County contends that the verdict at the close of all the evidence because there was insufficient evidence to establish the existence of a custom or policy which caused the deliberate indifference. According to the County, there was only one incident in the record to support the existence of a governmental policy or custom - Hatfield's deliberate indifference and Chairman Kelson's statement to Mandel's father that he would not intervene. Relying on City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed. 2d 791 (1985), the County argues that a single act cannot establish governmental policy or custom for purposes of § 1983, unless the policy itself is unconstitutional. Here, the County asserts, its policy was "to provide medical attention to the inmates of the Road Prison by stationing a duly licensed physician's assistant at

the Road camp to work under the supervision of a licensed medical doctor." Brief of Appellant 31. Such a policy can hardly be deemed unconstitutional. Accordingly, the County argues, the one act of Chairman Kelson is insufficient to establish governmental liability.

The County's sole argument at trial and on appeal was premised upon the Supreme Court's decision in City of Oklahoma City v. Tuttle, in which a plurality of the Supreme Court held that, in cases involving unconstitutional acts of low-level municipal employees, the plaintiff may prove custom or policy by showing a pattern of unconstitutional acts. The instant case, however, concerns altogether different methods of proving custom or policy: the delegation of final policymaking authority from one offical to another and the Ratification of a subordinate's actions by a final policymaker. See Tuttle, 471 U.S. at 834, 105 S.Ct. at 2441 (Brennan, J., concurring in part and concurring in the Judgment) ("there may be many way of proving

the existence of a municipal policy or custom that can cause a deprivation of a constitutional Right"). Recent Supreme Court decisions have traced the contours of these alternative theories of addressing when a local government may be held liable under § 1983 for a single decision by a government policymaker.

[8] In Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court upheld a finding of municipal liability for the violation of plaintiff's Fourth Amendment rights where deputy sheriffs unlawfully entered plaintiff's office on the express instructions of the county prosecutor. Because the county prosecutor "was acting as the final decision maker for the county" at the time he ordered the deputy sheriffs to enter the office, the Court concluded the county could be held liable under § 1983. 475 U.S. at 484-85 106 S.Ct. at 1301. Thus, Pembaur stands for the proposition that,

Under certain circumstances, municipal liability may be imposed for a single decision by a municipal policymaker. 475 U.S. at 480, 106 S.Ct. at 1298.

In City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Court sought to clarify the question of "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." 485 U.S. at 123, 108 S.Ct. at 924 (plurality opinion). The Court in Praprotnik held that a municipality could not be held liable for the unconstitutional transfer of a city employee where the officials who arranged for the transfer did not possess final policymaking authority with respect to employment decisions and had not been delegated such authority. Praprotnik reaffirmed that "the authority to make municipal policy is necessarily the authority to make final policy." 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion) (emphasis in original).

39. B.

The Court concluded that the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policy-making authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review. PRAPROTNIK, 485 U.S. at 125-28, 108 S.Ct. at 925-926.

Futhermore, the PRAProtnik plurality made clear that the question of whether an official has final policy-making authority is a question of state law. 485 U.S. at 124, 108 S.Ct. at 924 (Plurality opinion). Most important for this case, the PRAProtnik plurality stated that final policymaking authority could be delegated, and that the delegation issue was a question of state law:

'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course,

40. B

whether such official had final policymaking authority is a question of state law."
Id. at 124, 108 S.Ct. at 924 (quoting Pembaur v. Cincinnati, 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion)).

Just this last term, in Jett v. Dallas Independent School District, ___ U.S. ___, 109 S.Ct. 2702, 105 L.Ed. 2d 598 (1989), a majority of the Supreme Court adopted the Praprotnik plurality's view that identification of the official or final policymaker is a question of state law, to be determined by the trial Judge and not by the Jury:

[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial Judge before the case is submitted to the Jury. Reviewing the relevant legal materials, including state and local positive law, as well [as] 'custom or usage' having

41.B

the force of law, the trial Judge must identify those officials or governmental bodies who speak with final policy making authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivations of Right at issue...

Jett, ___ U.S. at ___, 109 S.Ct. at 2723 (emphasis in original) (quotation and citation omitted).

Although identification of the policymaker may often involve fact-sensitive inquiries, the Supreme Court has determined as a matter of policy that courts, and not juries, are to make this decision. "Municipalities can not be expected to perdict how courts or juries will assess their 'actual power structures,' and this

uncertainly could easily lead to Results that would be hard in practice to distinguish from the Results of a Regime governed by the doctrine of Respondeat Superior. It is one thing to charge a municipality with Responsibility for the decisions of officials invested by law, with policymaking authority. It would be something else, and something inevitably more capricious, to hold a municipality Responsible for every decision that is perceived as "final" through the lens of a particular factfinder's evaluation of the city's "actual power structure'" Praprotnik, 485 U.S. at 124 n.1, 108 S.Ct. at 924 n.1

For these Reasons, every Circuit Court of appeals, including this court, that has addressed this issue since Praprotnik, has concluded that the identification of the final policymaker is a question of state law for the trial Judge, not for the Jury. See Owens v. Fulton County,

43.B

877 F.2d 947, 950-51 (11th Cir. 1989); Parker v. Williams, 862 F.2d 1471, 1478-81 (11th Cir. 1989). See also Arnold v. Bd. of Educ. of Escambia County, 880 F.2d 305, 316 (11th Cir. 1989). Accord Worsham v. City of Pasadena, 881 F.2d 1336, 1340 (5th Cir. 1989); Praprotnik v. City of St. Louis, 879 F.2d 1573, 1574 (8th Cir. 1989); Starrett v. Wadley 876 F.2d 808, 818-19 (10th Cir. 1989); Zook v. Brown, 865 F.2d 887, 894-95 (7th Cir. 1989).

[9-13] As the above discussions of Jett, Praprotnik, and Pembaur make clear, municipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question. Under this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the governmental unit. Jett, ___ U.S. at ___, 109 S.Ct. at 2723.

As already discussed, this is a question of law to be resolved by the trial court judge. Id. See Praprotnik, 485 U.S. at ___, 108 S.Ct. at 924. In making this determination, the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law. Jett, ___ U.S. at ___ 109 S.Ct. at 2723. See Pembaur, 475 U.S. at 485, 106 S.Ct. at 1301 (county prosecutor found to be final policymaker based in part on relevant operational practices). See also Williams v. Butler, 863 F.2d 1398, 1403 (8th Cir. 1988) (in banc) (plurality opinion), cert. denied, ___ U.S. ___, 109 S.Ct. 3215, 106 L.Ed. 2d 565 (1989). The court must also ensure that the municipal official possesses the authority and responsibility for establishing final policy with respect to the issue in question. See Praprotnik, 485 U.S. at 127, 108 S. Ct. at 926; Pembaur, 475 U.S. at 483-84, 106 S.Ct at 1300. Only after this determination is made is the second step of the

45. B

INQUIRY RELEVANT: Did the challenged decision or act of the official cause the deprivation of the plaintiff's Rights? The answer to this question is, of course, FOR the Jury. See Jett, ___ U.S. at ___, 109 S. Ct. at 2723.

[4] In this case, the district court clearly understood the delegation theory of governmental liability at issue as outlined in Pembaur, Praprotnik and Jett when it held that final policymaking authority with respect to medical decisions at the Road prison had been delegated to Hatfield. As noted above, this issue of whether final policymaking authority was delegated to Hatfield is a question of state law to be decided by the district court, and not to be submitted to the Jury. Accordingly, our standard of review is not premised upon whether a reasonable Jury could find otherwise; Rather, we must independently review the district court's decision on this matter of state law.

We agree with the district courts conclusion that Hatfield was acting as final policymaker for the County with respect to the medical affairs at the Road prison. The County had entered into a memorandum of understanding with the health department and had established a policy that medical care for inmates at the Road prison would be provided by a physician's assistant. Although it was initially contemplated that the physician's assistant would be supervised by a medical doctor, the evidence revealed that a custom and practice developed so that policy was that Hatfield was authorized to function without any supervision or review at all. The policy was that Hatfield's medical decisions were subject to no supervision or review, except to the extent that Hatfield himself, in his sole and unsupervised discretion, deemed appropriate. We agree with the district court that Hatfield was the sole and final policymaker with respect to medical affairs at the Road prison.

[15]  OF COURSE, WE PROPERLY accord some difference to the evaluation of the district Judge who is familiar with local law, See National Fire Insurance Co. V. Housing Development Co., 827 F.2d 1475, 1480 (11th Cir. 1987), and who had before him all the evidence adduced as to the structure of this local government with Respect to medical policymaking at the Road prison. Our independent Review of this issue of state law leads us to agree with the district court that the County did delegate to Hatfield final policymaking authority with Respect to medical affairs at the Road prison. Because Hatfield had been delegated the final policymaking authority with Respect to medical affairs at the prison, his acts of deliberate indifference can be attributed to the County so as to establish municipal liability. See Pembaur, 475 U.S. at 483-84, 106 S.Ct. at 1292 (municipality may be liable under § 1983 where "a deliberate choice is made from among various alternatives by the

official or officials responsible for establishing final policy with respect to subject matter in question.").

## B Denial of Defendant's Directed Verdict Motion

The County argues that the district court erred, not only in directing a verdict in Mandel's favor on the issue of County liability, i.e., the Monell issue, but also in denying the county's own motion for directed verdict on that issue. Logically following our conclusion immediately above that the district court properly directed a verdict for Mandel on this issue, we thus affirm the district's courts denial of the count's motion for directed verdict on the issue.

## IV. Conclusion

The district court properly denied defendant's motions for directed verdict on the issues of deliberate

indifference and monell liaibility. The district court correctly directed a verdict for Mandel on the monell issue.

Accordingly, the Judgment of the district court is Affirmed.

part of 1

# In The United States District Court for the Middle District of Pennsylvania

## Civil Action

## Case No.

## Case Law

# West v. Atkins

## 487 U.S. 101

### No. 87-5096

RE:  Physician in Respect as to "Acting under; Color of State Law."

# West V. Atkins
### 487 U.S. 101
### L.Ed. 2d 40
### No. 87-5096

Inmate brought civil Rights action against physician who was under contract with state to provide medical services and state officials. The United States District of North Carolina granted officials and physician summary judgment and appeal was taken. The Court of Appeals Fourth Circuit, 799 F.2d 923, Remanded. The District Court dismissed the claim and appeal was taken. The Court of Appeals, 815 F.2d 993, affirmed dismissal of complaint and petition was filed for writ of certiorari. The Supreme Court, Justice Blackmun, held that physician who was under contract with state to provide medical services to inmate at state prison hospital on part-time basis acted under color of state law, within meaning of § 1983, when he treated inmate.

## Reversed and Remanded

Justice Scalia, concurred in part and concurred in judgment and filed opinion

1.) Civil Rights - 13.3 (1), 13.5 (2)

To state a claim under § 1983, plaintiff must allege violation of rights secured by Constitution and laws of the United States, and must show that alleged deprivation was committed by person acting under color of state law.

42 U.S.C.A. § 1983.

2.) Civil Rights - 13.5 (2)

Definition of acting under color of state law requires that defendant in § 1983 action have exercised power possessed by virtue of state law and made possible only because wrongdoer is clothed with authority of state law.

42 U.S.C.A. § 1983

3.) Civil Rights - 13.5 (3)

Defendant in § 1983 suit acts under color of state law when he

abuses position given to him by state.

42 U.S.C.A. § 1983

4.) Civil Rights - 13.5 (3)

Generally, public employee acts under color of state law within meaning of § 1983 while acting in his official capacity or while exercising his responsibilities pursuant to state law.

42 U.S.C.A § 1983.

5.) Civil Rights - 13.5 (4)

A physician who was under contract with state to provide medical services to inmates at state prison hospital on part-time basis acted under color of state law, within meaning of § 1983, when he treated inmate; such conduct was fairly attributable to state.

42 U.S.C.A. § 1983

6.) Civil Rights - 13.7

Defendants are not Removed from purview of § 1983 action simply because they are Professionals acting in accordance with professional discretion and Judgment; there is no Rule that professionals are subject to suit under § 1983 unless professional was exercising custodial or supervisory authority.

42 U.S.C.A. § 1983.

7.) Civil Rights - 13.5 (4)

It is physician's function within state system, providing treatment to prison inmates, not precise terms of his employment, that determines whether his actions can fairly be attributed to state under § 1983.

42 U.S.C.A. § 1983

8.) Civil Rights – 13.5 (4)

Contracting out prison medical care does not relieve state of its constitutional duty to provide adequate medical treatment to those in its custody, and does not deprive state's prisoners of means of vindication of their Eighth Amendment Rights under § 1983.

U.S.C.A. Const. Amend. 8;
42 U.S.C.A. § 1983

9.) Civil Rights – 13.5 (4)

Fact that physician's employment contract with state did not require him to work exclusively for prison in treating prisoners did not make him any less state actor than if he performed duties as full-time, permanent member of state prison medical staff; rather, it was physician's function while working for state, not amount of

time he spent in performance of those duties or fact that he might be employed by others to perform similar duties, that determined whether he was acting under color of state law.

42 U.S.C.A. § 1983

10.) Civil Rights — 13.5 (3)

Fact that state's employee's role parallels one in private sector is not, by itself, reason to conclude that former is not acting under color of state law within meaning of § 1983 in performing his duties.

42 U.S.C.A. § 1983

# Syllabus*

Respondent, a private physician under contract with North Carolina to provide orthopedic services at a state-prison hospital on a part-time basis, treated petitioner for a leg injury sustained while petitioner was incarcerated in state prison. Petitioner was barred by state law from employing or electing to see a physician of his own choosing. Alleging that he was given inadequate medical treatment, petitioner sued Respondent in Federal District Court under 42 U.S.C. § 1983 for violation of his Eighth Amendment right to be free from cruel and unusual punishment, Relying on Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L.Ed. 2d 251. The court entered summary judgment for respondent, holding that, as a "contract physician," respondent was not acting "under color of state law," a jurisdictional prerequisite for a § 1983 action. The Court of Appeals ultimately affirmed.

Held: A physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law," within the meaning of § 1983 when he treats an inmate. Pp. 2254-2260.

(a) If a defendant's alleged infringement of the plaintiff's constitutional rights satisfies the state-action requirement of the Fourteenth Amendment, the defendant's conduct also constitutes action "under color of state law" for § 1983's purposes, since it is "fairly attributable to the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935, 937; 102 S. Ct. 2744, 2752, 2753. Thus, a state employee generally acts under color of state law when, while performing in his official capacity or exercing his official responsibilities, he abuses the position given to him by the state. Polk County v. Dodson, 454 U.S. 312, 102 S. Ct. 445, 70 L. Ed. 2d 509, distinguished. Pp 2255-2256.

(b) The Court of Appeals erred in concluding that defendants are removed from § 1983's purview if they are professionals acting in accordance with professional discretion and judgment and that professionals may be liable under § 1983 only if exercising custodial or supervisory authority. The court's analogy between respondent and the public defender in Polk County, supra, is unpersuasive. Pp. 2256-2258.

(c) Respondent's conduct in treating petitioner is fairly attributable to the State. The State has an obligation, under the Eighth Amendment and state law, to provide adequate medical care to those whom it has incarcerated. Estelle, supra, 429 U.S. at 104, 97 S.Ct., at 291; Spicer v. Williamson, 191 N.C. 487, 490, 132 S.E. 291 293. The State has delegated that function to physicians such as respondent, and defers to their professional judgment. This analysis is not altered by the fact that respondent was paid by contract and was not on the state

payroll nor by the fact that Respondent was not required to work exclusively for the prison. It is the physician's function within the state system, not the precise terms of his employment, that is determinative. Pp. 2258-2260.

815 F.2d 993 (CA4 1987) Reversed and Remanded.

Blackmun, J., delivered the opinion of the Court, in which Rehnquist, C.J., and and Brennan, White, Marshall, Stevens, O'connor, and Kennedy, JJ., joined Scalla, J., filed an opinion concurring in part and concurring in the Judgment, post, p. 2260.

Justice Blackmun delivered the opinion of the Court.

This case presents the questions whether a physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law," within the meaning of

Under it, Doctor Atkins was paid approximately $52.000 annually to operate two "clinics" each week at Central Prison Hospital, with additional amounts for surgery. Over a period of several months, he treated West's injury by placing his leg in a series of casts. West alleges that although the doctor acknowledged that surgery would be necessary, he refused to schedule it, and that he eventually discharged West while his ankle was still swollen and painful, and his movement still impeded. Because West was a prisoner in "close custody," he was not free to employ or elect to see a different physician of his own choosing.

Pursuant to 42 U.S.C. § 1983, West, proceeding pro se, commenced this action against Doctor Atkins in the United States District Court for the Eastern District of North Carolina for violation of his Eighth Amendment Right to be free from cruel and unusal punishment. West alleged that Atkins was deliberately indifferent to his serious medical needs, by failing to provide adequate treatment.

Relying on a decision of its controlling court in Calvert v. Sharp, 448 F.2d 861 (CA4 1984), cert. denied, 471 U.S. 1132, 105 S. Ct. 1132, 86 L.Ed. 2d 283 (1985), the District Court granted Doctor Atkins' motion for summary judgment. In Calvert, the Fourth Circuit held that a private orthopedic specialist, employed by a nonprofit professional corporation which provided services under contract to the inmates at the Maryland House of Correctional and the Maryland Penitentiary, did not act "under color of state law," a jurisdictional requisite for a § 1983 action. Because Doctor Atkins was a "contract physician," the District Court concluded that he, too, was not acting under color of state law when he treated West's injury. App. 37.

A panel of United States Court of Appeals for the Fourth Circuit vacated the District Court's judgment. 799 F.2d 923 (1986). Rather than considering if Calvert could be distinguished, the panel remanded the case to the District Court for an assessment whether the record

permitted a finding of delib-
erate indifference to a serious medical
need, a showing necessary for West ul-
timately to prevail on his Eighth Amend-
ment claim. See Estelle v. Gamble, 429
U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed. 2d 251
(1976).

On en banc rehearing, however, a
divided Court of Appeals affirmed the
District Court's dismissal of West's com-
plaint. 815 F.2d 993 (1987). In declining
to overrule its decision in Calvert, the maj-
ority concluded:

"Thus, the clear and practicable prin-
ciple enunciated by the Supreme Court
[in Polk County v. [Dodson,] 454 U.S. 312,
102 S.Ct. 445, 70 L.Ed. 2d 509 (1981)],
and followed in Calvert, is that a pro
fessional, when acting within the bounds
of traditional professional discretion
and judgment, does not act under
color of state law, even where, as in
Dodson, the professional is a full-time
employee of the state. Where the
professional exercises custodial or

supervisory authority, which is to say that he is not acting in his professional capacity, then a § 1983 claim can be established, provided the requisite nexus to the state is proved." 815 F.2d, at 995.

The Court of Appeals acknowledged that this rule limits "the range of professionals subject to an Estelle action." Ibid.

The dissent in the Court of Appeals offered three grounds for holding that service rendered by a prison doctor—whether a permanent member of a prison medical staff, or under limited contract with the prison—constitutes action under color of state law for purposes of § 1983. First, the dissent concluded that prison doctors are as much "state actors" as are other prison employees, finding no significant difference between Doctor Atkins and the physician-employees assumed to be state actors in Estelle, and in O'Connor v. Donaldson, 422 U.S. 563,

95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). See 815 F.2d, at 997-998. Second, the dissent concluded that the "public function" rationale applied because, in the prison context, medical care is within "the exclusive prerogative of the State," in that the State is obligated to provide medical services for its inmates and has complete control over the circumstances and sources of a prisoner's medical treatment. Id., at 998-999, citing Blum v. Yaretsky, 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982). Finally, the dissent reasoned that the integral role the prison physician plays within the prison medical system qualifies his actions as under color of state law. 815 F.2d, at 999, citing United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966) ("[W]illful participant in joint activity with the State or it's agents" may be liable § 1983); Lugar v. Edmondson Oil Co., 457 U.S. 922, 931-932, 102 S.Ct. 2744, 2750-2751, 73 L.Ed.2d 482 (1982); and Tower v. Glover, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984).

The Fourth Circuit's Ruling conflicts with decisions of the Court of Appeals for the Eleventh Circuits, Ancata v. Prison Health Services, Inc., 769 F.2d 700 (1985), and Ort v. Pinchback, 786 F.2d 1105 (1986), which are to the effect that a physician who contracts with the State to provide medical care to prison inmates, even if employed by a private entity, acts under color of state law for purposes of § 1983. We granted certiorari to resolve the conflict. 484 U.S. 912, 108 S.Ct. 256, 98 L.Ed. 2d 214 (1987).

## II

[1]  To state a claim under § 1983, a plaintiff must allege the violation of a Right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (overruled in part on other grounds,

Daniels v. Williams, 474 U.S. 327, 330-331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). Petitioner West sought to fulfill the first requirement by alleging a violation of his Rights secured by the Eighth Amendment under Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 258, 50 L.Ed.2d 251 (1976). There the Court held that deliberate indifference to a prisoner's serious medical needs, whether by a prison doctor or by a prison guard, is prohibited by the Eighth Amendment. Id., at 104-105, 97 S.Ct. at 291. The adequacy of West's allegation and the sufficiency of his showing on this element of his §1983 cause of action are not contested here. The only issue before us is whether petitioner has established the second essential element - that Respondent acted under color of state law in treating West's injury.

[2] The traditional definition of acting under color of state law requires that the defendant in a §1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1034, 85 L. Ed. 1368 (1941). Accord, Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L. Ed. 2d 492 (1961) (1961) (adopting Classic standard for purposes of § 1983) (overruled in part on other grounds, Monell v. New York City Dept. of Social Services, 436 U.S. 658, 695-701, 98 S.Ct. 2018 2038-2041, 56 L. Ed. 2d 611 (1978); Polk County v Dodson, 454 U.S. 312, 317-318, 102 S.Ct. 445, 449, 70 L. Ed. 2d 509 (1981); id., at 329, 102 S.Ct., at 455-456 (dissenting opinion). In Lugar v. Edmondson Oil Co., supra, the Court made clear that if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, "that conduct [is] also action under color of state law and will support a suit under §1983."

Id., 457 U.S., at 935, 102 S.Ct. at 2752. Accord, Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L. Ed. 2d 418 (1982); United States v. Price, 383 U.S., at 794, n. 7, 86 S.Ct., at 1157, n. 7. In such circumstances, the defendant's alleged infringement of the plaintiff's federal rights is "fairly attributable to the State." Lugar, 457 U.S., at 937, 102 S.Ct. at 2753.

[3, 4] To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State... or by a person for whom the State is responsibe," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Ibid. "[S]tate employment is generally sufficient to render the defendant a state actor." Id., at 936, n. 18, 102 S.Ct., at 2753, n. 18; see Id., at 937, 102 S.Ct., at 2754. It is firmly established that a defendant in a §1983 suit acts under color of state law when he abuses the position given to him by the State.

See Monroe V. Pape, 365 U.S., at 172, 81 S. Ct., at 476. Thus, generally, a public employee acts under color of state law while exercising his responsibilities pursuant to state law. See, e.g., Parratt V. Taylor, 451 U.S., at 535-536, 101 S.Ct., at 1913; Adickes V. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct., 1598, 1605-1606, 26 L.Ed.2d 142 (1970). See also Flagg Bros., Inc. V. Brooks, 436 U.S., at 157, n.5, 98 S.Ct., at 1734, n.5.

Indeed, Polk County V. Dodson, relied upon by the Court of Appeals, is the only case in which this Court has determined that a person who is employed by the State and who is sued under § 1983 for abusing his position in the preformance of his assigned tasks was not acting under color of state law. The Court held that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal

PROCEEDing." 454 U.S., at 325, 102 S.Ct. at 453. In this capacity, the Court noted, a public defender differs from the typical government employee and state actor. While performing his duties, the public defender retains all of the essential attributes of a private attorney, including, most importantly, his "professional independence," which the State is constitutionally obliged to respect. Id., at 321-322, 102 S.Ct. at 451. A criminal lawyer's professional and ethical obligations require him to act in a role independent of and in opposition to the State. Id., at 318-319, 320, 102 S.Ct. at 450. The Court accordingly concluded that when representing an indigent defendant in a state criminal proceeding, the public defender does not act under color of state law for purposes of §1983 because he "is not acting on behalf of the State; he is the State's adversary." Id., at 323, n. 13, 102 S.Ct., at 452, n. 13. See also Lugar v. Edmondson Oil Co., 457 U.S.,

at 936, n. 18, 102 S. Ct., at 2753, n.18.

### B.

[5] We disagree with the Court of Appeals and Respondent that Polk County dictates a conclusion that Respondent did not act under color of state law in providing medical treatment to petitioner. In contrast to the public defender, Dr. Atkins' professional and ethical obligation to make independent medical judgments did not set him in conflict with the State and other prison authorities. Indeed, his relationship with other prison authorities was cooperative. "Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve." Polk County, 454 U.S., at 320, 102 S.Ct., at 451. The Manual governing prison health care in North Carolina's institutions, which

Dr. Atkins was required to observe, declares: "The provisions of health care is a joint effort of correctional administrators and health care providers, and can be achieved only through mutual trust and cooperation." Similarly the American Medical Association Standards for Health Services in Prisons (1979) provide that medical personnel and other prison officials are to act in "close cooperation and coordination" in a "joint effort." Preface, at i; Standard 102, and Discussion. Doctor Atkins' professional obligations certainly did oblige him to function as "the State's adversary." Polk County, 454 U.S., at 323, n. 13, 102 S.Ct., at 452, n. 13. We thus find the proffered analogy between Respondent and the public defender in Polk County unpersuasive.

[6] Of course, the Court of Appeals did not perceive the adversarial role the defence lawyer play in our criminal justice system as the decisive factor in the Polk County decision.

The court, instead, appears to have misread Polk County as establishing the general principle that professionals do not act under color of state law when they act in their professional capacities. The court considered a professional not to be subject to suit under § 1983 unless he was exercising "custodial or supervisory" authority. 815 F.2d, at 995. To the extent this Court in Polk County relied on the fact that the public defender is a "professional" in concluding that he was not engaged in state action, the case turned on the particular professional obligation of the criminal defense attorney to be an adversary of the State, not on the independence and integrity generally applicable to professionals as a class. Indeed, the Court of Appeals' reading would be inconsistent with cases, decided before and since Polk County, in which this Court either has identified professionals as state actors, see, e.g., Tower v. Glover, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984) (state public

defenders), or has assumed that professionals are state actors in §1983 suits, see, e.g., Estelle v Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L. Ed. 2d 251 (1976) (medical director of state prison who was also the treating physician). See also Youngberg v. Romeo, 457 U.S. 307, 322-323, and n. 30, 102 S. Ct. 2452, 2461-2462, and n. 30 (1982) (establishing standards to determine whether decisions of "professional" regarding treatment of involuntarily committed can create liability for a due process violation). Defendants are not removed from the purview of §1983 simply because they are professionals acting in accordance with professional discretion and judgment.

The Court of Appeals' approach to determining who is subject to suit under §1983, wholeheartedly embraced by respondent, cannot be reconciled with this Court's decision in Estelle, which demonstrates that custodial and supervisory functions are irrelevant to an assessment whether the particular action challenged was performed under color of state law.

In Estelle, the inmate's Eighth Amendment claim was brought against the physician-employee, Dr. Gray, in his capacity both as treating physician and as medical director of the state prison system. See 429 U.S., at 107, 97 S.Ct. at 292-293. Gray was sued, however, solely on the basis of allegedly substandard medical treatment given to the plaintiff; his supervisory and custodial functions were not at issue. The Court's opinion did not suggest that Gray had not acted under color of state law in treating the inmate. To the contrary, the inference to be drawn from Estelle is that the medical treatment of prison inmates by prison physicians is state action. The Court explicitly held that "indifference... manifested by prison doctors in their response to the prisoner's needs... states a cause of action under § 1983." Id., at 104-105, 97 S.Ct., at 291; see id., at 104, n. 10, 97 S.Ct., at 291 n.10 (citing with approval Courts of Appeals' decisions holding prison doctors liable for Eighth Amendment claims brought under § 1983

without mention of supervisory and custodial duties). The Court of Appeals' rationale would sharply undermine this holding.

### C.

We now make explicit what was implicit in our holding in Estelle: Respondent, as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of §1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the state.

The Court recognized in Estelle: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S., at 103, 97 S. Ct., at 290. In light of this, the Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate

medical care to those whom it has incarcerated. Id., at 104, 97 S. Ct., at 291. See also Spicer v. Williamson, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926)(common law Requires North Carolina to provide medical care to its prison inmates), cited in Estelle, 429 U.S., at 104, n. 9, 97 S. Ct., at 291, n. 9. North Carolina employs physicians, such as Respondent, and defers to their professional Judgment, in order to fulfill this obligation. By virtue of this Relationship, effected by state law, Doctor Atkins is authorized and obliged to treat prison inmates, such as West. He does so "clothed with the authority of state law." United States v Classic, 313 U.S., at 326, 61 S. Ct., at 1043. He is "a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S., at 937, 102 S. Ct. at 2754. It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could Receive for his injury was that provided by the State.

If Dr. Atkins misused his power by demonstrating deliberate indifference to West's serious medical needs, the resultant deprivation was caused, in the sence relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care.

[7,8] The fact that the State employed Respondent pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other "state employees" does not alter the analysis. It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner.

Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment Rights. The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to Respondent Atkins; and Respondent voluntarily assumed that obligation by contract.

[9, 10] Nor does the fact that Doctor Atkins' employment contract did not require him to work exclusively for the prison make any less a state actor than if he performed those duties as a full-time, permanent member of the state prison medical staff. It is the physician's function while working for the State, not the amount of time he spends in

PERFORMANCE of those duties or the fact that he may be employed by other to perform similar duties, that determines whether he is acting under color of state law. In the State's employ, RESPONDENT worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated. Doctor Atkins must be consider to be a state actor.

## III

FOR the REASONS stated above, we conclude that RESPONDENT's delivery of medical treatment to West was state action fairly attributable to the State, and that RESPONDENT therefore acted under color of state law for purposes of § 1983. Accordingly, we REVERSE the Judgment of the

Court of Appeals and Remand the case for further proceedings consistent with opinion.

It is so ordered.

Justice SCALIA, concurring in part and concurring in the Judgment.

I agree with the opinion of the Court that Respondent acted under color of state law for purposes of §1983. I do not believe that a doctor who lacks supervisory or other penological duties can inflict "punishment" within the meaning of that term in the Eighth Amendment. Cf. Johnson v. Glick, 481 F.2d 1028, 1031-1032 (CA2) (Friendly, J.), cert. denied sub nom. John v. Johnson, 414 U.S. 1033, 94 S.Ct. 462 38 L.Ed.2d 324 (1973). I am also of the view, however, that a physician who acts on behalf of the State to provide needed medical atten-tion to a person involuntarily

in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the Fourteenth Amendment's protection against the deprivation of liberty without due process. See Youngberg v. Romeo, 457 U.S. 307, 315, 324, 102 S.Ct. 2452, 2457-2458, 2462-2463 (1982) (dictum); See generally Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); Ingraham v. Wright, 430 U.S. 651, 672-674, and n. 41, 97 S.Ct. 1401, 1413-1414, and n.41 (1977); Rochin v. California 342 U.S. 165, 169-174, 72 S.Ct. 205, 208-210, 96 L.Ed. 183 (1952); Johnson, supra, at 1032-1033. I note that petitioner's pro se' complaint merely claimed violation of his rights, and it is the Courts that have specified which constitutional provision confers those rights.

H

part of 1

# In The United States District Court for the Middle District of Pennsylvania

## Civil Action

## Case No.

---

## Case Law

Carswell v. Bay County

No. 87-3710

11th Cir. 1988

RE: Sufficient evidence of, Deliberate Indifference to establish liability, with respect to; Contract with County, also Acting under: Color of State Law.

Also: criteria needed to support a Tort Claim.

Carswell v. Bay County
No. 87-3710
(11th Cir. 1988)
Northern District
Florida

Inmate asserted federal civil
rights claim and state tort claims
against county, sheriff, jail adminis-
trator, physician's assistant who work-
ed at jail, and physician who provided
medical services to inmates under con-
tract with county, alleging they fail-
ed to provide proper medical treatment
to inmate. The United States District
Court for the Northern District of
Florida, No. MCA85-2109RV, C. Roger
Vinson, J., entered judgment on jury
verdict in favor of inmate, and appeals
were taken. The Court of Appeals, Vance,
Circuit Judge, held that: (1.) private
physician under contract with county
acted under color of state law for pur-
poses of civil rights statute;

(2) there was sufficient evidence of deliberate indifference to establish liability of administrator and physician's assistant; (3.) Jury's verdict awarding $10,000 on constitutional claim and $40,000 on state law claims was not inconsistent; and (4.) district court properly applied Florida's collateral source rule.

Affirmed

1.) Civil Rights - 13.5 (4)

Private physician who was under contract with county to provide medical services to Jail inmates acted under color of state law and, thus, was subject to liability in inmate's civil Rights action for failure to provide proper medical treatment to inmate, though physician maintained he had no supervisory or custodial duties in Jail and never treated inmate.

42 U.S.C.A. § 1983

## 2.) Civil Rights — 13.13 (3)

There was sufficient evidence of deliberate indifference to inmate's medical needs by Jail administrators and physician's assistant who worked at Jail to sustain verdict against them on inmate's civil right's claim, though physician's assistant examined inmate on three different occasions and some of inmate's request's for laxatives and pain relievers were satisfied; there was evidence that physician's assistant ignored warning of other person's on Jail's staff and failed to advise physician of inmate's weakening condition, and that administrator saw inmate's deteriorating condition during rounds at Jail, received request specifically addressed to him from inmate for medical attention, and was asked by public defender to get inmate to physician, but did nothing significant to ensure that inmate received medical attention.

42 U.S.C.A. § 1983

3.) Civil Rights - 13.14

Jury's verdict finding jail administrator, physician's assistant who worked at jail, and private physician under contract with county to provide services to jail inmates liable for $10,000 in compensatory damages on state law negligence claims was not inconsistent; jury could have found that inmate was injured primarily by early negligence of administrator and physician's assistant.

42 U.S.C.A.§ 1983

4.) Damages - 59

Under Florida's collateral source rule, actual payment of inmate's medical expenses by county operated to reduce any damage award against sheriff and jail administrator, against whom inmate asserted constitutional and state law claims for failing to provide proper medical treatment.

West's F.S.A. § 951.032

Before TJoflat, Vance and Cox, Circuit Judges.

Vance, Circuit Judge:

This action arising under 42 U.S.C.A. § 1983 involves the failure to proper medical treatment to a county jail inmate. The defendants appeal from a jury verdict in favor of the plaintiff, Stephen Carswell. Carswell also appeals the district court's application of Florida's collateral source rule. For the reasons set forth below, we affirm the district courts judgment.

## I. FACTS

On August 21, 1984 Carswell was committed to Bay County Jail in Panama City, Florida, as a pretrial detainee. Carswell was not given a physical examination at the time he entered the jail, but he indicated during the medical screening procedure that he was not

suffering from any ailment or taking any medication. At the time he entered Bay County Jail Carswell was 5'11" and weighed approximately 145 pounds.

Over the next eleven weeks Carswell repeatedly requested medical treatment. Complaining of a rash, constipation and significant weight loss, Carswell made numerous written and oral requests for medication and medical attention. Labeled a "complainer," Carswell received the the medication he requested, generally milk of magnesia, on some occasion but other requests simply were ignored. On two occations during this period Graham Belz, a physician's assistant who worked at the Jail, examined Carswell. On September 18 Belz prescribed a cream for skin rash. On October 2 Belz diagnosed Carswell as having tonsillitis and constipation, and prescribed medication accordingly.

Carswell, however, continued to complain about health problems.

On November 5, 1984 Carswell was taken to court for arraignment. The public defender observed that the plaintiff "looked like a concentration camp victim." The public defender immediately asked William Grigsby, the jail administrator who had accompanied Carswell to the arraignment, to arrange for medical attention, Grigsby testified that upon returning to the jail he simply yelled into a crowded room: "Get this man to see a doctor."

Two days latter, on November 7, Belz examined Carswell again. Carswell had then lost approximately fifty-three pounds, and weighed only ninety-two pounds. That evening Carswell was admitted to the hospital where he was diagnosed as a diabetic. Carswell remained hospitalized for approximately two months and eventually recovered.

Carswell brought this action against Bay County, Sheriff Lavelle Pitts, the Jail administrator William Grigsby, Graham Belz and DR. Thomas Merrill, a physician who provided medical services to the inmates pursuant to a contract. The complaint included a section 1983 claim alleging that appellants were deliberately indifferent to Carswell's serious medical needs and pendent state tort claims alleging negligence.

The Jury returned a verdict in favor of Sheriff Pitts and against Grigsby, Belz and Merrill on the constitutional claim. The Jury found compensatory damages on the constitutional claim to be $10,000. On the state law tort claims the Jury found Sheriff Pitts negligent and liable for $10,000 in compensatory damages and found Merrill and Belz negligent and responsible for $40.000 in compensatory damages. The Jury awarded no punitive damages. The district court entered Judgments of $10.000 against Belz, Merrill and Grigsby, jointly and

severally, an additional $40,000 against Belz and Merrill, jointly and severally, and $10,000 against Pitts.

## II. Defendants' Appeal

Appellants raise three issues on appeal: (1.) whether a physician under contract with the county to provide medical services to inmate acts "under color of state law" so as to be subject to liability under section 1983; (2.) whether there was sufficient evidence to support the jury's findings against Grigsby and Belz of "deliberate indifference" to Carswell's medical needs; and (3.) whether the judgment should be vacated due to an inconsistent jury verdict. We find that the district court properly ruled on each of these issues.

## A.

To maintain an action under section 1983, a plaintiff must establish that the defendant acted under color of state

United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941); see Polk County v. Dodson, 454 U.S. 312, 317-18, 102 S.Ct. 445, 449, 70 L.Ed. 2d 509 (1981); Ort v. Pinchback, 786 F.2d 1105, 1107 (11th Cir 1986). A person acts under color of state law whe that individual exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law...." Classic, 313 U.S. at 326, 61 S.Ct. at 1043.

Appeallant MERRILL asserts that as a private physician under contract with the Bay County Jail to provide medical services to the inmates, he was not acting under color of State law. MERRILL argues that he is not subject to liability under section 1983 because he had no supervisory or custodial duties in the Jail and never treated Carswell. Relying on this courts decision in Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir. 1985),

the district court ruled that state action was present. See also Ort, 786 F.2d at 1107 (a private physician who contracted with the state to render services to a prisoner acted under color of state law); Morrison v. Washington County, Ala., 700 F.2d 678, 683-84 (11th Cir.) (doctor who "obtained significant aid from state officials" in making decisions was acting under color of state law), cert denied, 464 U.S. 864, 104 S. Ct. 195, 78 L. Ed. 2d 171 (1983).

The court's position on this issue was recently approved by the Supreme Court in West v. Atkins, ___ U.S. ___, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). In West the Court held that a private physician who is under contract with a state to provide medical care to inmates acts "under color of state law for purposes of section 1983 when undertaking his duties" to treat an inmate. Id. 108 S. Ct. at 2258. The Court emphasized that it was simply stating explicitly what it had stated

implicitly in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976). The Court Recognized, as it had in Estelle, that the state had a constitutional duty to provide adequate medical care to its prison inmates, West, 108 S.Ct. at 2259. The Court then state it was the function of the physicians while working for the state, not the amount of time the physicians spend in performance of thier duties or the fact that they may be employed by other to perform similar duties, that determines whether they are acting under of state law and is liable under section 1983.

## B.

[2] The second issue Raised by appellants is whether there was sufficient evidence against Grigsby and Belz to support the Jury's finding of deliberate indifference to Carswell's medical needs. Appealant's point out that Belz examined Carswell on three different occasions and that Carswell's

numerous requests for laxatives and pain relievers were satisfied. Although they did not diagnose Carswell's condition correctly, Grigsby and Belz contend that in light of their efforts, their conduct did not amount ot deliberate indifference.

We think the jury properly could find that acts of Grigsby and Belz constituted deliberence. The evidence in this case established that Grigsby and Belz had knowledge of Carswell's need for medical care. The record indicates that two persons on the jails staff, Emergency Medical Technician Monroe and Correctional Officer Eldridge, each recognized Carswell's medical problems and informed Belz of Carswell's serious situation. Each time, however, Belz ignored the warnings. Belz also failed to advise Merrill of Carswell's weakening condition. The evidence further established that Grigsby saw Carswell's deteriorating condition during rounds at the

Jail, received a request specifically addressed to him from Carswell for medical attention and was asked by the public defender to get Carswell to a doctor. Grigsby still did nothing significant to ensure that Carswell received medical attention.

Under Section 1983 "Knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." Ancata, 769 F. 2d at 704. We believe that with evidence of knowledge the jury could have concluded that failure to provide Carswell with medical care constituted deliberate indifference. We therefore hold that there was sufficient evidence of deliberate indifference by Grigsby and Belz

C.

[3.] Appellants also argue that the jury's verdict is inconsistent. The jury found that Grigsby, Merrill and Belz were deliberately indifference to Cars-

-well's medical needs and liable for 10,000 compensatory damages on the constitutional claim. The jury also found that Merrill and Belz were negligent and liable for $40,000 in compensatory damages on the state law claims. Appellants argue that there is "no ligical or reasonable way" for the jury to have found that that compensatory damages were $10,000 when caused by the deliberate indifference to medical needs and $40,000 when caused by negligence. Appellants believe that the jury instructions and the verdict form confused the jury and appellants maintain that they alerted the court to the possible confusion on three different occasions.

We believe that the jury's verdict should not be disturbed. We note initially that appellants did not object at trial to the jury instructions and verdict form given by the court. Absent a formal objection, an issue is not preserved for appeal. Litman v. Massachusetts Mut. Life Ins. Co., 739 F.2d 1549, 1557 (11th Cir. 1984),

cert. denied, ___ U.S. ___, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988). Regardless of this shortcoming, our review of the record and the Jury's verdict reveals no inconsistency. "[T]he Seventh Amendment demands that, if there is a view of the case which makes the Jury's answers consistent, this Court must adopt that view." Aquachem Co., Inc. v. Olin Corp., 699 F.2d 516, 521 (11th Cir. 1983); See Burger King Corp. v. Mason, 710 F.2d 1480, 1489 (11th Cir. 1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984).

Appellee presents a reasonable explanation for the verdict. The evidence presented at trail described the sequence of events in Carswell's medical treatment. Appellee submits that the Jury could have found that Carswell was injured primarily by the early negligence of Merrill and Belz. Then at some point after Carswell had lost a substantial amount of weight, the inaction of Merrill, Belz and Grigsby constituted deliberate

indifference. Appellee suggests that the Jury's finding of Sheriff Pitts' negligence may be grounded on his general indifference towards the medical care provided at the Jail. Because there is logical explanation for the Jury's answers, we will not disturb the Jury's verdict.

## III. Plaintiff's Appeal

[4] Carswell's appeal raises the issue of whether Florida's collateral source rule permits recovery of medical expenses from Grigsby as well Bay County. Prior to trial Bay County and Carswell entered into a settlement agreement. Under the terms of the agreement Carswell dismissed his claim against Bay County and Bay County dismissed its counterclaim under Fla. Stat. § 951.032 for the recovery of medical expenses incurred during Carswell's hospitalization. Because Carswell continued see compensatory and punitive damages against Sheriff Pitts and

Grigsby, the district court entered an order ruling that the actual payment of Carswell's medical expenses by Bay County operated to reduce any damage award against Pitts and Grigsby.

Carswell argues that under Florida's collateral source rule an injured party's receipt of total or partial compensation "from a collateral source wholly independent of the wrongdoer will not lessen the damages recoverable from the person causing the injury." James v. Baptist Hosp. of Miami Inc., 349 So. 2d 672, 673 (Fla. Dist. Ct. App. 1977), cert, denied, 355 So. 2d 512 (Fla. 1978). He maintains that Grigsby and Bay County should be viewed as independent tortfeasors.

Florida's law, however, limits the application of this rule in order to prevent "an undeserved and unnecessary windfall to the plaintiff." Florida Physician's Ins. Reciprocal v. Stanley, 452 So. 2d 514, 515 (Fla. 1984). Rejecting Carswell's collateral source claim,

the district court noted that Florida's common law collateral source rule only operates when the collateral benefits are earned in some way. Id.; See Winston Towers 100 Ass'n, Inc. v. De Carlo, 481 So.2d 1261, 1262 (Fla. Dist. Ct. App. 1986). The district court concluded that Bay County's payment of medical expenses was not earned because the county was entitled by statute to recover the medical payments. We believe that the district court properly applied the collateral source rule. Even if Grigsby and Bay County are not viewed as joint tortfeasors, Florida's limitation on the collateral source rule bars the recovery sought by Carswell. The amount of Bay County medical payment therefore reduced the damage award against Grigsb

IV. Conclusion

For the foregoing reasons the district court's decisions is:

Affirmed.

I.

part of 1

# In The United States District Court for the Middle District of Pennsylvania

## Civil Action

## Case No.

_____

## Case Law

Aldridge v. Montgomery

No. 83-8302

11th Cir.

RE: In supporting of Plaintiff's Request for a Jury Trial.

Also: Issues of Starner's § 1983 Complaint surpass' a Directed Verdict. Only a Jury can Fairly hear said Complaint.

Aldridge v. Montgomery
No. 83-8302
(11th Cir)
Feb. 21, 1985

State prisoner brought Civil
Rights Act suit complaining of alleged
denial of medical treatment while a pre-
trial detainee and while confined follow-
ing conviction. The United States District
Court for the Southern District of Geor-
gia, Dudley H. Bowen, Jr., J., directed ver-
dicts in favor of all but two of the de-
fendant's and rendered judgment on
Jury verdict for those defendant's and
prisoner appealed. The Court of appeals
held that: (1) Evidence as to delay in
obtaining treatment for eye injury
and alleged failure to give ice packs and
aspirin prescribed by a doctor was for
Jury as regards claims against county
defendants, and (2) it was for Jury
to determine whether prisoner had
serious medical need to examine
him and whether that physician

showed deliberate indifference to prisoner's needs.

Reversed and Remaned

1.) Federal Courts - 764, 798

The standard for reviewing granting of motions for directed verdict is whether, considering all of the evidence in the light most favorable to the opponent, the facts and inferences point so strongly and overwhelmingly in favor to one party that reasonable persons could not reach a different conclusion.

2) Civil Rights - 13.4 (3,5)

To state a civil rights act claim for inadequate medical care while in prison, an inmate must show deliberate indifference to a serious medical need to establish violation of constitutional right to be free from cruel and unusual punishment, whereas a pretrial detainee

has a due process right to
be free from punishment altogether

U.S.C.A. Const. Amend. 8, 14; 42 U.S.C.A.
§ 1983.

3.) Civil Rights - 13.4 (5)

Deliberate indifference suffi-
cient to make a constitutional viola-
tion is shown not only by failure
to provide prompt attention to med-
ical needs of a pretrial detainee, but
also by intentionally interfering
with treatment once prescribed.

42 U.S.C.A. § 1983; U.S.C.A. Const. Amend. 14

4.) Civil Rights - 13.14

Whether officers at county jail
violated plaintiff's rights as pretrial
detainee by ignoring one and a half inch
cut above the eye for two and a
half hours was for jury in civil
Rights action, considering that it

took six stitches to close the wound and that there was blood on floor and on appellant's coat and shirt, and Jury was also to resolve claimed violation by failing to give plaintiff ice packs and aspirin prescribed by a doctor for pain.

42 U.S.C.A. § 1983; U.S.C.A. Const. Amend. 14.

(5.) Civil Rights - 13.14

Whether doctor at state prison showed dilberate disregard of prisoner's medical needs, Rising to level of an Eight Amendment violation, was for Jury in civil rights action in view of doctor's statement, speaking to prisoner through cell bars, that she would "doctor" the medical records, as was issue of serious medical need concerning complaints of headaches and dizziness and history of head injuries.

42 U.S.C.A. § 1983; U.S.C.A. Const. Amend. 8.

Before Kravitch and Johnson, Circuit Judges, and Tuttle, Senior Circuit Judge.

Per Curiam:

I. Background

Appellant, an inmate at Georgia State Prison, brought this action under 42 U.S.C.A. §1983 against two wardens at the Georgia State Prison, four officers of the Ware County Sheriff's Department, two officers of the Georgia State Patrol, and a physician at Georgia State Prison. The district court granted motions for directed verdict in favor of all deffendants except one officer of the Sheriff's Department and one Georgia State Patrol officer, allegedly involved in beating the appellant during his arrest. A jury verdict was rendered in favor of those two defendants.

The two key issues which we feel warrant consideration concern appellant's claims of unconstitutional denial of necessary medical assistance at the Ware County Jail before his trial and at the Georgia State Prison after his conviction. Because the district court granted a directed verdict as to both of these issues, we summarize the facts relevant to these issues in the light most favorable to the appellant. Significiently, in addition to this standard, the state appellees expressly admitted the correctness of the apellant's statement of the facts relating to occurrences at the State prison.

(1) As to the Ware County Jail

On Febuary 10, 1980, appellant was arrested by several officers of the Ware County Sheriff's Department and two officers of the Georgia State Patrol. During the arrest, there was a scuffle in which appellant received a one and

a half cut above his Right eye. After the arrest, appellant was taken to the Ware County Jail and placed in a holding cell for over two hours The cut continued to bleed, forming a pool of blood on the floor approximately the size of two hands. Appellant was then taken to the hospital where his cut Required six stitches. The doctor on duty in the emergency Room directed defendant Grant to give appellant icepacks and aspirin for his wound. Neither of these was given to the appellant.

## (2) As to the State Prison

After conviction, appellant was confined at Georgia State Prison at Reidsville. In July of 1980, he asked to see a doctor about severe headaches and dizziness that he felt were caused by the injury he received during his arrest. Defendant Dr. Stankovic responded to appellant's Request to be examined.

DR. Stankovic appeared outside of appellant's cell and upon hearing appellant's complaint told him ". . . that she would go back and doctor [his] records." DR. Stankovic had possession of appellant's medical history, which included many serious head injuries. He had been injured in an automobile accident, had broken his neck in a swimming accident, had suffered a brain concussion, and had received other blows to his head too numerous for appellant to specify at trial.

Appellant filed a grievance with the warden following DR. Stankovic's refusal to examine him. The warden referred the grievance to DR. Stankovic who reported that appellant had been examined, given medication and referred to the hospital for his complaint. However, DR. Standkovic based this report on an examination made by another doctor in 1979, six months before appellant received the injury which may have caused the headaches

and dizziness of which he was complaining. Moreover, Dr. Stankovic testified at trial that she was aware that the records in her possession were based on an examination prior to appellant's February 1980 injury.

## II. ISSUES

The two key issues for consideration by this Court are as follows:

1.) Whether the trial court erred in directing a verdict for defendants as to appellant's allegations of constitutionally inadequate medical care at Ware County Jail.

2.) Whether the trail court erred in directing a verdict for defendants as to appellant's allegations of constitutionally inadequate medical care at Georiga State Prison.

# III. Discussion

## A. Legal Standards

[1] The standard of review for this Court in reviewing the granting of a motion for directed verdict is whether, considering all of the evidence in the light most favorable to the opponent, the facts and inference point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion. Kaye v. Pawnee Construction Co., Inc., 680 F.2d 1360 (11th Cir. 1982).

[2] We recognize that problems relating to inadequate medical care may require different standards of care between pretrial detainees (the Ware County case).

To state a claim under 42 U.S.C. § 1983 for inadequate medical care while in prison, an inmate must show deliberate indifference to his serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976). The holding of Estelle Relates to a convicted prisoner's Eighth Amendment Right to be free from cruel and unusual punishment, whereas a pretrial detainee has a Fourteenth Amendment due process Right to be free from punishment altogeter, Bell v Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979). The Supreme Court, in a resent case holding that a city is not obligated to pay for medical services for inmates so long as such services are in fact provided, reiterated that the due process clause of the Fourteenth Amendment "does require the responsible government or governmental agency to provide medical care to persons... who have been indured while being apprehended by the police. In fact, the due process Rights of a [pretrial detainee] are at least as great as the Eighth Amendment protection available to a convicted prisoner."

*City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 103 S.Ct. 2979, 2983, 77 L.Ed. 2d 605, 611 (1983). The Court did not decide the precise limits of a governmental agency's duty to provide medical care to pre-trial detainees beyond the *Estelle v. Gamble* test, indicating only that "[W]hatever the standard may be, Revere fulfilled its constitutional obligation by seeing that [the pretrial detainee] was taken promptly to a hospital that provided the treatment necessary for his injury."
*Id.*

## B. Treatment at Ware County Jail

[34] Appellant argues that the officers at the Ware County Jail violated his rights as a pre-trial detainee by ignoring the bleeding cut for two and one half hours. The appellant stresses the facts that the cut was at least one and a half inches long, that it required six stitches, that there was blood on the floor and

on his coat and shirt. The appellant notes that the arresting officers apparently held appellant for so long without treatment because they were waiting for a detective to tell them what to do.

Appellant also argues that the officers violated his rights by failing to give him the icepacks and aspirin prescribed by the doctor for pain upon his return to the jail. Deliberate indifference is shown not only by failure to provide prompt attention to the medical needs of a pre-trial detainee, but also by "intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 105, 97 S.Ct. at 291. Appellant notes that the doctor even gave the deputy two rubber gloves in which to put ice but that the deputy nevertheless failed to administer any ice or medication for the pain. Viewing the evidence in the light most favorable to the plaintiff, appellant contends that there is a

question of the fact such that the Ware County officals showed a deliberate indifference to the serious medical needs of the appellant both before and after his wound received stitches. Thus, appellant contends that the directed verdict was improper.

The defendants respond that any delay or inadequacy of medical care which the appellant received while held in the Ware County Jail did not rise to the level of a constitutional infringement. The defendants note that the appellant was taken to the hospital where his wound was sutured approximately two and a half hours after his arrest. The sutures were later removed and there was never any infection of the cut. During the time he was in the holding cell, the plaintiff was able to walk, talk, and make sense.

The defendants contend that this Court, in reviewing the grant of a motion for a directed verdict, should consider all the evidence, not just that which supports the non-mover's case, Kaye, 680 F.2d at 1364. Thus, the defendants point to uncontradicted testimony concerning the county's legitimate interest in the secure and efficient administration of the Jail. The Jailer testified that it was his responsibility to advise the officer in charge when someone might need medical treatment and that officer would then make a determination as to what treatment was needed. In this case, the Jailer notified the detective. The detective testified that he was the senior officer in the sheriffs office at the time, that it was standard procedure for the detective to take charge of the case, that he remained at the crime scene about an hour and a half, and that the first thing he did when he returned to the Jail was to examine the plaintiff and

to send the plaintiff to the hospital.

We conclude that the first issue raised by these opposing contentions could not be resolved by a direct verdict.

## C. Treatment in Georgia State Prison

[5] The appellant argues that the facts as summarized above concerning Dr. Stankovic's response to his request for medical assistance show a deliberate disregard of his medical needs. The trial court found Dr. Stankovic's testimony about the grievance to be "patently incredible." The court stated, "...It appears to me that there is an indifference, whether or not it is deliberate, then that is up to the jury. And if it were my determination to make, I would say that she was deliberate [sic] indifferent. The problem with it is whether or not it is a serious medical need."

Appellant argues that the evidence of headaches and dizziness coupled with an extensive history of traumatic blows to the head arguably meet any definition of "serious medical need." Appellant note that DR. Stankovic had in her possession appellant's medical history showing the series of head injuries summarized above. Appellant testified that his headaches were more pronounced and were located in a different area of his head after his injury in February 1980. Appellant argues that given the plaintiff's previous injuries to his head, complaints of headaches and dizziness could have proven very serious. Viewing the evidence in the light most favorable to the plaintiff, therefore, the appellant contends that a jury could reasonably determine that the plaintiff established a serious medical need and that, therefore, the directed verdict was improper.

The defendants concede that the RECORD does REVEAL some confusion on the part of DR. Stankovic as to the chronology of the events in appellant's treatment. Defendants contend, however, that appellant's ARREST-Related injury was the only one which reportedly occured subsequent to his examination by a neurologist in 1979, and because that injury was in the opinion of all medically trained witnesses, not a serious one, the trial court correctly granted the motion for a directed verdict. The defendants note that the neurologist who examined appellant in 1979 had recommmened the very course of treatment subsequently followed by defendants and that this examination had occurred following all but the last of appellant's alleged head injuries. Defendants also note that section 1983 does not insure that inmates will RECEIVE excellent medical care but only that they will be protected from deliberate indifference

to their serious medical needs. Estelle. Section 1983 does not protect against medical malpractice.

Viewing the facts as of the time of Dr. Stankovic's refusal even to examine appellant, we are satisfied that there was a jury issue whether appellant at that time had a serious medical need. There was certainly a jury issue on the claim that Dr. Stankovic did show deliberate indifference to appellant's needs in light of the conceded truth of the doctor's statement that she would "doctor" the medical records.

The judgments are reversed and the case is remanded for further proceedings not inconsistent with this opinion.